No. 98,389

STATE OF KANSAS, *Appellee,* v. KIMBERLY DANIELLE SHARP,
*Appellant.*
(210 P.3d 590)

74

Opinion filed June 19, 2009.

*Debra J. Wilson*, of the Capital Appeals and Conflicts Office, argued the cause and was on the brief for appellant.

*Robert D. Hecht,* district attorney, argued the cause, and *Jamie L. Karasek,* assistant district attorney, and *Steve Six,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: Kimberly Sharp was convicted of felony murder and kidnapping and received concurrent sentences of life without the possibility of parole for 20 years for the murder and 61 months for the kidnapping. She now directly appeals her convictions. Our jurisdiction is under K.S.A. 22-3601(b)(1) (conviction of an off-grid crime). The convictions and sentences of one of her codefendants, Carl Lee Baker, who was tried separately, were affirmed by this court in *State v. Baker,* 287 Kan. 345, 197 P.3d 421 (2008).

The issues on appeal, and our accompanying holdings, are as follows:

1. Did the trial court err in denying Sharp's motion to suppress her confession? No.

2. Did the trial court err in limiting the defense's cross-examination of an accomplice witness? No.

3. Did the trial court err in admitting into evidence statements from two codefendants under the coconspirator exception to the hearsay rule? No.

4. Did cumulative error deny Sharp a fair trial? No.

Accordingly, we affirm Sharp's convictions.

## FACTS

As an advocate for the homeless, David Owen used unconventional methods. These methods included offering the use of his phone cards and cell phones for them to call their loved ones. Owen also tried to force them to return to their families by destroying their camps and taking their equipment and supplies. He often photographed the destroyed camps and carried the pictures while visiting other camps.

Owen had been reported missing for several weeks when on July 2, 2006, a canine search team found his body in a heavily wooded area on the bank of the Kansas River in Topeka. No personal property, including identification, shoes, socks, or eyeglasses, was located on or around Owen's body. The officers recovered an axe

and some pieces of rope when they searched the surrounding area. The coroner opined that Owen had been dead for several weeks or months, and he listed the manner of death as homicide. Approximately 10 days after discovery of Owen's body, defendant Kimberly Sharp and three other homeless people—her boyfriend Charles Hollingsworth, Carl Lee Baker, and John Cornell—were arrested and subsequently charged with kidnapping and felony murder.

Sharp and Hollingsworth were seated on a bench near the river when detectives first encountered them. Detective Bryan Wheeles noticed that Sharp was scared, so he walked her further down the street, away from Detective Mike Barron and Hollingsworth. Wheeles explained that they needed to talk to her about their investigation into Owen's death. Wheeles and Barron then separately transported Sharp and Hollingsworth to the Topeka Police Department to be interviewed.

Wheeles was informed on the way to the station that there was an outstanding warrant for Sharp out of Emporia, Kansas. When they reached the station, Sharp was put in an interview room where Wheeles *Mirandized* her after telling her that she was under arrest. Wheeles did not tell her specifically why she had been placed under arrest.

Wheeles then conducted a fully recorded interview with Sharp. The interview contained three basic parts: (1) an initial interview lasting 20 or 30 minutes in which Sharp described most of the events surrounding Owen's kidnapping; (2) a re-enactment of the crimes with Wheeles at the homeless camp; and (3) a final interview at the station.

During Sharp's initial interview, she told Wheeles that on Thursday, June 15, 2006, she was sitting around a campfire with Hollingsworth, Baker, and Cornell. Around 7 p.m., Owen walked into the camp and told these homeless people that they should not camp and should call their families. Everyone was upset by his remarks, especially when he said he would have burned their camp if they had not been there.

Sharp told Wheeles that Baker began arguing with Owen, who then said he was going to call the police. When Owen reached for

his phone, Baker and Hollingsworth knocked him to the ground. Hollingsworth then struck Owen and dragged him into the woods.

According to Sharp, she also headed into the woods to see what was going on. There she saw Owen on his knees and Hollingsworth with "an axe that he was going to [use to] kill him like that." Sharp told Hollingsworth, "[N]o, don't do that, don't do that. I can't be an accessory to this shit, you know. I can't do that. I got two kids . . . ." She said Cornell then brought Hollingsworth a rope which was used to tie up Owen. Baker stuffed a rag in Owen's mouth, and the two men continued to beat him. Sharp told Wheeles that Cornell then burned all of Owen's possessions, including his pictures, notebooks, shoes, and socks. Hollingsworth and Baker then dragged Owen into the woods, and Sharp never saw Owen again.

After additional discussion during which Sharp continued to deny any participation, Wheeles specifically asked if she helped burn Owen's possessions. She denied helping burn or having Owen's phone or bag at any point. Sharp eventually admitted that she helped burn. When Sharp then asked if she was going to jail, Wheeles responded, "No, no, no, no, no, no, no, no. You are a witness to this thing as long as you do not do something dumb and jam yourself." He further explained that if she had been scared she should tell him and, "Just don't tell me no if I ask you something." Sharp then detailed her role in burning Owen's phones and notebooks.

After Sharp informed Wheeles that her two kids were with Baker at another homeless camp, he left the interview. Upon his return he told her they were going to work together to get her kids "out of harm's way." He advised that Baker was a registered sex offender and had an outstanding arrest warrant for a parole violation. They then left together, retrieved the kids, and brought them back to the station within the hour to be with Sharp.

Approximately 1 hour later Wheeles escorted Sharp to the camp where she re-enacted the events surrounding Owen's kidnapping and murder. During the re-enactment, Sharp told Wheeles that when Hollingsworth was standing over Owen with an axe, she had said to him, "No, don't kill him." Wheeles requested clarification,

"Did you say 'No, don't kill him,' or did you say, 'No, don't kill him here?' " Sharp responded, "Don't kill him *here.*" (Emphasis added.) Sharp also admitted that Hollingsworth had then asked her to bring him some rope, and she told Cornell to go get it. She further admitted that it was her idea to burn Owen's things so there would not be any evidence to tie her to the events. "I said we have to burn it 'cause I don't need the evidence. I don't want to be tied to this."

Following the re-enactment, Wheeles brought Sharp back to the station. He asked her a few more questions and then left her alone in the interview room with her children. Approximately 1 hour after returning to the station, Wheeles was notified that the district attorney's office had decided to charge Sharp. When Wheeles told her that she was going to be placed under arrest, she became angry and upset. Sharp accused Wheeles of lying to her and said that he had tricked her, telling him, "This is bullshit." .

Sharp later moved to suppress her statements. After a hearing, the trial court denied her motion. Her recorded statements were subsequently played to the jury.

Sharp testified at trial. Consistent with her initial interview and re-enactment, she admitted to burning two of Owen's phones, his picture album, and some loose papers. Also consistent with her re-enactment, she admitted that Hollingsworth asked her to bring some rope, and she told Cornell to go get some. However, while during the re-enactment she had admitted telling Hollingsworth, "[D]on't kill him *here,*" she testified to simply saying, "Don't kill him." (Emphasis added.)

Pursuant to a plea bargain, codefendant Cornell also testified at trial, painting a slightly different picture of Sharp. According to Cornell, Sharp got angry when she opened Owen's bag and saw the pictures Owen had taken of other destroyed camps. She then grabbed the phone and threw it in the incinerator. Sharp got madder and madder, and then threw Owen's entire bag in the fire.

Cornell admitted that he took the rope from Baker and gave it to Hollingsworth. He testified that Sharp had followed Hollingsworth into the woods with Owen, and she stood by as Cornell handed over the rope. At that time Sharp told Cornell that they

were going to make Owen sleep outside with the mosquitoes. According to him, Sharp said, "We're not gonna kill him, we're just gonna tie him up to a tree, have him spend the night outside." Consistent with Sharp's statement about her belief that when she saw Owen on his knees and Hollingsworth with "an axe, that he was going to kill him like that," Cornell testified that Sharp said she thought Hollingsworth "was gonna chop [Owen] up."

Cornell further testified that Owen was brought back to the camp briefly before Hollingsworth and Baker dragged him out of sight to the levee. He said that after they left, Sharp asked him to dump the incinerator in the next camp because it was smoldering and smelled bad. Cornell and Sharp remained in the camp burning Owen's items while the others were gone.

According to Cornell, when Hollingsworth and Baker returned to the camp without Owen, Sharp asked them how Owen was doing. Hollingsworth responded by saying, "[P]robably dead by now" and "He was turning blue when we left." Later that night while hunting for firewood, Baker told Cornell that Hollingsworth had "lynched" Owen.

The jury found Sharp guilty of kidnapping and felony murder. She was sentenced to concurrent sentences of life imprisonment without the possibility of parole for 20 years on the felony-murder conviction, and 61 months for the kidnapping conviction.

Additional facts will be provided as necessary to the analysis.

## ANALYSIS

Issue 1: *The trial court did not err in denying Sharp's motion to suppress her confession.*

Sharp argues that her confession should have been suppressed because it was involuntary and unreliable. She primarily argues that her confession, including her re-enactment at the crime scene, was exchanged for "an explicit promise of leniency." Specifically, Sharp contends that Detective Wheeles promised her she would not go to jail in connection with Owen's murder and that this promise, combined with his assurances that he would help her and her children, as well as her "particularly vulnerable position," all worked to overcome her will.

Sharp argues that these factors combined to lead her to make two critical, involuntary admissions to Wheeles during the subsequent re-enactment: (1) that she told Hollingsworth, "Don't kill him *here*," which suggests she had no objection to Owen being killed elsewhere, and (2) that it was her idea to burn Owen's items: "*I* said we have to burn it 'cause *I* don't need the evidence. *I* don't want to be tied to this." (Emphasis added.)

The State primarily counters that the evidence does not support Sharp's claim that she was improperly induced to make her confession.

*Standard of Review*

When analyzing a trial court's denial of a motion to suppress a defendant's confession, an appellate court reviews "the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard." An appellate court does not "reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence." *State v. Harris*, 284 Kan. 560, Syl. ¶ 9, 162 P.3d 28 (2007); *State v. Swanigan*, 279 Kan. 18, 23, 106 P.3d 39 (2005). The determination of whether a confession is voluntary is a legal conclusion requiring de novo review. *Swanigan*, 279 Kan. at 31; see *Arizona v. Fulminante*, 499 U.S. 279, 287, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991).

We have held that "the voluntariness of a confession must be determined under the totality of circumstances." *State v. Brown*, 285 Kan. 261, Syl. ¶ 2, 173 P.3d 612 (2007). "The State has the burden of proving that a confession is admissible, and the required proof is by a preponderance of the evidence. The essential inquiry is whether the statement was the product of the accused's free and independent will. [Citation omitted.]" *Brown*, 285 Kan. at 272. Other courts have described the question as whether the authorities overbore the defendant's will and critically impaired his or her capacity for self-determination. See, *e.g.*, *United States v. Lopez*, 437 F.3d 1059, 1064-65 (10th Cir. 2006); *United States v. LeBrun*, 363 F.3d 715, 725 (8th Cir. 2004).

Our analysis must acknowledge that "coercive police activity is a necessary predicate to the finding that a confession is not vol-

untary." *Colorado v. Connelly*, 479 U.S. 157, 167, 93 L. Ed. 2d 473, 107 S. Ct 515 (1986). We must also recognize that the United States Supreme Court has used a "coerced confession" interchangeably with an "involuntary" one. See *Fulminante*, 499 U.S. at 288 (detailing facts of *Payne v. Arkansas*, 356 U.S. 560, 2 L. Ed. 2d 975, 78 S. Ct. 844 [1958]). Thus, coercion can include inducing by promise, as well as by threat.

Numerous factors are to be considered when determining if a statement is involuntary, which this court has consolidated into the following nonexclusive list based on previous Kansas case law:

"(1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language." *State v. Johnson*, 286 Kan. 824, 836, 190 P.3d 207 (2008) (citing to *State v. Walker*, 283 Kan. 587, 596-97, 153 P.3d 1257 [2007]).

On appeal, Sharp concedes that she primarily relies upon the fifth factor: Detective Wheeles' fairness in conducting the interrogation, *i.e.*, because of his purported promises. We do not, however, form our conclusion by simply listing this one factor as possibly favoring involuntariness and enumerating all those other factors possibly favoring voluntariness. As one court has explained:

"[T]hese factors are not to be weighed against one another on a balance scale, with those favorable to a free and voluntary confession offsetting those tending to the contrary. Instead, the situation surrounding the giving of a confession may dissipate the import of an individual factor that might otherwise have a coercive effect. See *Brady* [*v. United States*], 397 U.S. [742,] 754, [25 L. Ed. 2d 747,] 90 S. Ct. [1463 (1970)]. Even after analyzing such dilution, if any, a single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act. [Citation omitted]" *Green v. Scully*, 850 F.2d 894, 902 (2d Cir. 1988).

*Cf. State v. Thompson*, 284 Kan. 763, 803-04, 166 P.3d 1015 (2007) (in considering totality of circumstances to determine whether a consent to search is voluntary, "we do not expect courts to merely count the number of factors weighing on one side of the determination or the other").

### Alleged promise of leniency/immunity

More than 100 years ago, this court addressed the then "well-settled law" of confessions:

"It is well settled that an extrajudicial confession will not be received in evidence unless it has been freely and voluntarily made. If it has been extorted by fear or induced by hope of profit, benefit, or amelioration, it will be excluded as involuntary. However, the advice or admonition to the defendant to speak the truth, which does not import either a threat or benefit, will not make a following confession incompetent." *State v. Kornstett,* 62 Kan. 221, 227, 61 P. 805 (1900) (cited with approval in *State v. Harris,* 284 Kan. 560, 579, 162 P.3d 28 [2007]).

This basic approach was clarified by the United States Supreme Court in *Fulminante,* 499 U.S. at 285:

"Although the Court noted in *Bram* [*v. United States,* 168 U.S. 532, 42 L. Ed. 2d 568, 18 S. Ct. 183 (1897)] that a confession cannot be obtained by ' "*any* direct or implied promises, *however slight,* nor by the exertion of *any* improper influence" ' . . . this passage from *Bram* . . . under current precedent does not state the standard for determining the voluntariness of a confession . . . ." (Emphasis added.)

On the issue of promises of leniency to the accused, this court has most recently stated

"that in order to render a confession involuntary *as a product of a promise of some benefit to the accused, including leniency,* the promise must concern action to be taken by a public official; it must be such that it would be likely to cause the accused to make a false statement to obtain the benefit of the promise; and it must be made by a person whom the accused reasonably believes to have the power or authority to execute it. [Citations omitted.]" (Emphasis added.) *Brown,* 285 Kan. at 276.

See K.S.A. 60-460(f)(2)(B).

### Motion to suppress

At the suppression hearing, the trial judge remarked that he observed Sharp's courtroom demeanor, observed Detective Wheeles testify, watched Sharp's recorded interviews with Wheeles and her recorded re-enactment, and heard the arguments of counsel. The court then found:

"[S]he was given her *Miranda* rights, she voluntarily gave up her *Miranda* rights, she talked, I saw her in that interview room, I saw her with a bottle of water . . . . In addition, there's times when she stretches out in the law enforcement room

when he [Wheeles] leaves, she stretches from one chair to another one. She appears to be very relaxed, very candid. Her responses are very clear. Occasionally maybe have to ask a question or what's meant. *At no time does she appear that she's under duress.* At no time does she appear that she's under the influence of anything in so far as her responses to any questions. At no time and definitely you can see it when she's walking in the area down by the river during the re-enactment she has no trouble positioning herself in different positions, positions Detective Wheeles in different positions where people were at given times allegedly when this alleged crime or crimes occurred. Um, she indicated eventually what participation she had in the alleged crime, or at least a portion of it if not all that, I do not know.

"Um, they got the kids, the kid[s] were in the room with her, she was appropriate in so far as the kids were concerned, in so far as trying to get them to quiet down . . . . *At no time did she appear she was under duress, coercion, operating under any promises.* Wheeles talked to the detective and the length of [detention] wasn't unusual, she was given things to drink, she was even taken out—she took them out to the scene of re-enactment. They went to two different camps while they were there. She was able to do that, she was able to walk around, her demeanor was fine. As the officer testified, she was cooperative, which comes across on the video." (Emphasis added.)

After making these findings, the court concluded that Sharp's statements were freely and voluntarily given:

"Therefore, the Court denies the motion to suppress and the statements in this court's opinion [were] freely, voluntarily and intelligently made and could be used at trial."

On appeal, Sharp highlights an excerpt of her digitally recorded interview—observed by the trial judge—as proof of Detective Wheeles' promise of leniency. Thirty-one minutes into the interview, and 25 pages into its transcript, Sharp tells Wheeles that while Baker and Hollingsworth were taking Owen to the river, a Mark Greene and a man named Joel came back to the campsite and noticed Cornell burning things. Sharp points to the italicized language:

"[Detective]:    They just saw John [Cornell] burning stuff?

"[Sharp]:    John—it was already melted. He had a fire going, I mean, real big and they just thought it was fire, you know. They just thought it was a fire.

"[Detective]:    If you were scared and you were helping him [Cornell] burn things because you were afraid they were going to hurt you if you didn't go along, you need to tell me that right now. Are you picking up on what I'm telling you?

"[Sharp]:      Uh-huh.

"[Detective]:      You cannot, cannot hold anything back in this thing at all, Kim, you can't. This is as serious as it comes.

"[Sharp]:      I know, I know, I know.

"[Detective]:      Okay.

"[Sharp]:      Yeah, I helped burn.

"[Detective]:      Okay. Now —

"[Sharp]:      *Am I going to jail?*

"[Detective]:      *No, no, no, no, no, no, no, no. You are [only] a witness to this thing as long as you do not do something dumb and jam yourself.* If you were scared, explain to me that you were scared—

"[Sharp]:      I was very.

"[Detective]:      —when you did what you did. I understand the whole situation.

"[Sharp]:      Okay.

"[Detective]:      *Just don't tell me no if I ask you something.*

"[Sharp]:      Okay.

"[Detective]:      Okay.

"[Sharp]:      They [Mark and Joel] left. Charles [Hollingsworth] told me, 'Burn everything,' told me and John [Cornell], 'Burn everything.'

"[Detective]:      Okay.

"[Sharp]:      I said, 'I ain't touching nothing,' you know and he said, 'You'll [not] be burnt, don't worry about it.' I took the phone, I took the phones, I burned those first and then we took and we looked in the notebook and stuff and burned those and we had two—there was two fires going and there was one in like a little camp fire thing, like a trash thing that you're supposed to really have for a camp and we burnt that, we burn that and then I told John to get the other fire pit going." (Emphasis added.)

At the suppression hearing, Wheeles testified about this excerpt and other parts of the interview. For example, he acknowledged that he told Sharp that she could stop talking to him if she ever felt uncomfortable. According to the transcript, at the outset he advised her of her *Miranda* rights, *e.g.*, her right to remain silent, right to an attorney, and that anything she said "can and will be used against you in a court of law." Immediately afterward, the interview transcript clearly reveals:

"[Detective]:      Do you want to talk to me or answer questions at least until you don't feel comfortable doing it anymore?

"[Sharp]:      Yeah, I'll do it."

Wheeles also testified at the hearing that he made no promises or threats to Sharp. He was particularly asked on cross-examination about the first portion italicized above. He explains that he did not recall using the words "I promise you":

"[Defense Counsel]: You told [the prosecutor on direct examination] that you made him [*sic*] no promises?
"[Detective]: Right.
"[Defense Counsel]: Let me ask you this: When she asked you if she was going to jail and you said, 'No, no, no, no, no, no, I promise you,' is that a promise?
"[Detective]: I don't recall. Did I say 'I *promise* you?' *If* it—yeah, *that* would be considered to be a promise. I thought she was going to be a witness in this case, as I've stated earlier." (Emphasis added.)

Wheeles was also cross-examined about the second portion italicized above, *i.e.*, "Just don't tell me no if I ask you something." He explains that this was simply another admonition to Sharp to tell him the truth because he had already caught her being untruthful:

"[Defense Counsel]: You did tell her 'just don't tell me no if I ask you;' you did say that, didn't you?
"[Detective]: *I told her to tell me the truth and not to lie. To my recollection, that's what I told her,* and I told her not to keep anything back and to tell me everything she knew about the case. And I was very specific about that from the beginning to the end, and *there were times when I had to gently confront her about stuff that she was telling me that was not the truth, and that's what was taking place* [there].
. . . .
"[Defense Counsel]: Did you say to Miss Sharp after your conversation with the other detective that you went in the hall and talked to, 'Just don't tell me no if I ask you'; did you say that?
"[Detective]: I don't remember the exact quote on that. *I explained to you that I told her to tell me the truth about the incident.*" (Emphasis added.)

Wheeles' explanation that he was actually "gently confronting" Sharp about her making untruthful statements, and exhorting her to now tell the truth, is supported by the record. According to the recorded interview, near its beginning Sharp had admitted telling one previous lie to him:

"[Sharp]:          I thought you might be really pissed at me because I lied [because she did not tell officers she knew Hollingsworth was giving a false name until separated from him by the officers].

"[Detective]:      Because you lied, no."

Moreover, given Sharp's admission later in the interview that she did help burn—set forth above—clearly she had been lying to Wheeles earlier in the interview when she had initially denied helping. The following transcript excerpt establishes that lie:

"[Detective]:      Now, here's an important part where you and I got to figure out. I know this is a scary deal for you. *I appreciate everything that you've been honest with me about and I want you to answer this question for as honestly too even*—because I understand you're in a bad situation here where you just see something like this happen and you're really probably very scared as to not go along could mean major problems for you.

"[Sharp]:          Oh, yeah.

"[Detective]:      Right? Like you could be in danger?

"[Sharp]: .         Oh, yeah.

"[Detective]:      *Did you help burn the stuff?*

"[Sharp]:          No.

"[Detective]:      *Did you have his phone and his bag at any point?*

"[Sharp]:          *No, I didn't.*

"[Detective]:      Okay.

"[Sharp]:          *I didn't.*

. . . .

"[Detective]:      And this whole time *John* is burning all the personal property?

"[Sharp]:          Right, I'm [just] sitting there flipping out." (Emphasis added.)

Wheeles was also cross-examined about his interview question to Sharp stated above: "Are you picking up on what I'm telling you?" He explained that the statement is still another example of his catching her in a lie, *i.e.*, denying to help burn when she had, then "gently confronting" her, and exhorting her to tell the truth because it would be "in her best interests":

"[Defense Counsel]: And you also indicated to Mrs. Sharp that, or do you recall just making the statement, 'Are you picking up on what I'm telling you?'

"[Detective]: *That was the first time when I confronted her with the information that she—that was the first time that I knew for certain that she was not telling me the entirety of the truthful account, yes.*

"[Defense Counsel]: And did she pick up on what you were telling her?

"[Detective]: *It was a gentle way of confronting her with the fact that I knew [she] wasn't telling me the truth* [about helping burn], *and yes she did, she changed her statement at that point* [to admit helping].

"[Defense Counsel]: And she changed the statement because you had indicated to her that it would be in her best interests to do that?

"[Detective]: No, I indicated to her *it was in the best interests to tell me the truth,* and that's why she changed her statement." (Emphasis added.)

Defense counsel himself appeared to characterize Wheeles' statements as simply telling Sharp to "just tell the truth," rather than trying to get her to incriminate herself. He asked on cross-examination:

"[Defense Counsel]: *And would it be fair to say,* I believe you said this, but my words, that you were *just looking for the objective truth about what she knew?*

"[Detective]: *I was looking for a complete and truthful account of what she knew about this incident, yes.*

. . . .

"[Defense Counsel]: And is it your sworn testimony, officer, that it was never your purpose to get Mrs. Sharp to try and incriminate herself?

"[Detective]: My question or my statement is that *I was there to get the truth of what she knew about this incident,* and if that did incriminate her, then that was a decision—those actions took place long before I got involved. *I just needed a truthful statement of what she knew.*" (Emphasis added.)

*Discussion*

As indicated earlier, the trial judge made a number of findings as required by our case law regarding the factors which form a substantial part of the calculus for determining voluntariness, *i.e.,* the "totality of the circumstances." *Johnson,* 286 Kan. at 836. These

case law factors include, but are not limited to, Sharp's mental condition; the manner and duration of the interrogation; her ability to communicate on request with the outside world; Sharp's age, intellect, and background; and the fairness of Wheeles conducting the interview. *Johnson,* 286 Kan. at 836.

In recent years this court has reviewed the record on appeal for substantial competent evidence to support the findings regarding these factors. Substantial competent evidence is that which possesses both relevance and substance and which furnishes a substantial basis in fact from which the issues can reasonably be resolved. *U.S.D. No. 233 v. Kansas Ass'n of American Educators,* 275 Kan. 313, 318, 64 P.3d 372 (2003). See, *e.g., State v. Ransom,* 288 Kan. 697, 706, 207 P.3d 208 (2009) (substantial competent evidence supports the trial court factual findings, *e.g.,* that defendant was not impaired by drugs or alcohol, that there were no signs of physical or psychological coercion, and that the manner and duration of interrogation were reasonable); *Johnson,* 286 Kan. at 834-35, 838 (substantial competent evidence supports trial court's factual findings, *e.g.,* defendant had capacity to understand his rights); *State v. Farmer,* 285 Kan. 541, 551, 175 P.3d 221 (2008) (on factor of fairness of officers' interrogation, substantial competent evidence supported finding that officer was unaware of any religious beliefs defendant held, whether he attended church or regularly read the Bible); *State v. Kirtdoll,* 281 Kan. 1138, 1147, 136 P.3d 417 (2006) (substantial competent evidence supports the district court findings, *e.g.,* of defendant's age, intellect, and background); *State v. Mattox,* 280 Kan. 473, 484, 124 P.3d 6 (2005) (substantial competent evidence supports findings that defendant was properly advised of *Miranda,* he understood those rights, he was 22 years old, had 2 years of college education, and was not under the influence of alcohol or drugs).

In short, our past application of this substantial competent evidence test establishes that district court determinations of these factors described in *Johnson* have been treated as findings of fact. See *Johnson,* 286 Kan. at 835 ("In reviewing a trial court's decision regarding suppression, this court reviews the factual underpinnings of the decision by a substantial competent evidence standard.").

This approach appears consistent with the United States Supreme Court's in *Fulminante*. 499 U.S. at 286-87 (great deference given to factual findings of lower court, *e.g.*, " 'because Fulminante was an alleged child murderer, he was in danger of physical harm at the hands of other inmates' ").

As mentioned, Sharp primarily challenges one trial court finding—"At no time did she appear she was under . . . coercion, operating under any promises"—to dispute the court's ultimate legal conclusion that her statements were "freely, voluntarily and intelligently made." See *Johnson*, 286 Kan. at 835; *Swanigan*, 279 Kan. at 31; *Fulminante*, 499 U.S. at 287. We reject her argument for a number of reasons, as more fully discussed below.

*Promise not go to jail and "don't tell me no if I ask you something"*

On the particular issue of whether promises of leniency were made, this court has considered those determinations as findings of fact. In *Swanigan*, 279 Kan. at 25-26, we held that substantial competent evidence supported the finding that although defendant was told several times that if he cooperated his cooperation would be conveyed to anybody who might pursue the case, no promises of leniency were made. Similarly, in *State v. Pham*, 281 Kan. 1227, 1242, 136 P.3d 919 (2006), we later held that substantial competent evidence supported the finding that " 'there were . . . no promises made by the agent as to any leniency or deals.' "

The Tenth Circuit Court of Appeals reviews judicial determinations regarding alleged promises of leniency in a similar fashion. In *United States v. Lopez*, 437 F.3d 1059, 1064 (10th Cir. 2006), the court expressly rejected the prosecution's argument that a district court determination that an agent's actions constituted a promise of leniency was not a factual finding. The Tenth Circuit also held in *United States v. Morris*, 247 F.3d 1080, 1089 (10th Cir. 2001), that a district court's finding—that officers' actions showing a suspect photos of "past criminals" and telling him that the ones who cooperated had received more lenient sentences—was not a promise of leniency. As in *Lopez*, that determination was also reviewed on appeal as a factual finding.

Under this deferential standard of review, we determine that substantial competent evidence certainly exists in the present record to support the district court's factual finding that Sharp was not "under . . . coercion, operating under any promises."

First, substantial competent evidence exists to support a finding that there was no promise made. In Wheeles' testimony at the suppression hearing, he expressly denied making any threats or promises to Sharp. This testimony is supported by the transcript of the interview: neither the words "promise" nor "threat" appear there. We acknowledge that promises can be implicit. However, Wheeles testified repeatedly that he was only trying to get Sharp to tell the complete truth because he kept catching her in lies and because telling the truth would be in her best interests.

Per the interview transcript, Wheeles told Sharp, "You cannot hold anything back in this thing at all . . . . This is as serious as it comes." She replied, "I know, I know, I know." He testified that reiterating to Sharp that she needed to tell the complete truth was his purpose in asking, "Are you picking up on what I'm telling you?" She replied, "Uh-huh."

According to Wheeles, he was again exhorting her to tell the truth when he told her, "Just don't tell me no if I ask you something." He testified he used this remark because "I had to gently confront her about stuff that she was telling me that was not the truth." At the time Wheeles told her this, he had already caught her in two lies. He testified that he again told her "not to keep anything back and tell me everything she knew." He was "very specific about that from beginning to end."

We acknowledge that Wheeles answered her question "Am I going to jail?" with a comment which can be readily construed as negative: "No, no, no, no, no, no, no, no. You're a witness to this thing as long as you do not do something dumb and jam yourself." But there is sufficient evidence in the record for the trial court to have determined—from Wheeles' express denial that he made any promises and from the overall context of this statement—that Wheeles was again simply admonishing Sharp to tell the truth. We observe that there was certainly enough evidence to lead Sharp's counsel into accepting Wheeles' explanation about the specific pur-

pose behind all of his questions and statements: "It would be fair to say . . . that you were just looking for the objective truth about what she knew."

The trial court may have relied upon this same evidence that Sharp's counsel found persuasive. It was certainly entitled to draw reasonable factual inferences from the evidence which we are not permitted to dispute by an inappropriate use of de novo review. See *State v. Brown*, 285 Kan. 261, 173 P.3d 612 (2007) (appellate court does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence); *U.S.D. No. 233*, 275 Kan. at 320 (appellate court accepts as true all inferences to be drawn from the evidence which support or tend to support the findings of the district court). Exhortations to tell the truth in this particular context do not make Sharp's statements involuntary. See *State v. Harris*, 284 Kan. 560, 162 P.3d 28 (2007).

Second, it could be argued that the trial court implicitly found that a promise had actually been made but that Sharp simply was not "operating under" that promise. Nevertheless, this too would be a factual finding subject to a review for substantial competent evidence. See *State v. Ransom*, 288 Kan. at 706, (substantial competent evidence supports the trial court factual findings that defendant was not impaired by drugs or alcohol and that there were no signs of physical or psychological coercion); *Mattox*, 280 Kan. at 484-85 (substantial competent evidence supported finding that defendant was not "under the influence of" alcohol or drugs); *State v. Hansen*, 199 Kan. 17, 20, 427 P.2d 627 (1967) ("Appellant principally emphasizes he was not in possession of his faculties [during confession] due to lack of insulin. The court found against him on this factual issue."). *Cf. State v. Ralls*, 216 Kan. 692, 693-94, 533 P.2d 1294 (1975) (defendant testified that during police questioning he was suffering from running nose, watering eyes, and headache; State admitted he was affected by tear gas, but no testimony as to his condition at either of the times he waived constitutional rights; court stated that great reliance must be placed upon finder of fact in confessions and could not say trial court erred in permitting admission of confession).

Similarly, the trial court factual finding that Sharp was not "operating under a promise" is also supported by substantial evidence showing that any actual promise by Wheeles was conditional and that Sharp had not met its conditions. See *Green v. Goble,* 7 Kan. 297, 302 (1871) (for a conditional promise, a party "cannot avail himself of the benefit of it without complying with the conditions"). These determinations involve questions of fact. *Cf. Nungesser v. Bryant*, 283 Kan. 550, 566, 153 P.3d 1277 (2007) ("When the evidence pertaining to the existence of a contract or the content of its terms is conflicting or permits more than one inference, a question of fact is presented.").

According to Wheeles' testimony in the record, he made it very clear that based upon what he knew so far, Sharp was merely a "witness to this thing." Accordingly, she was not going to jail "as long as you do not do something dumb and jam yourself." In other words, if Sharp did "jam" herself, *i.e.*, inculpate herself in criminal activity, she could very well still go to jail. Sharp did in fact proceed to inculpate herself, as evidenced by her desire to exclude two specific incriminating points she told Wheeles during the later re-enactment at the campsite. First, she told Wheeles that she had told Hollingsworth, "Don't kill him [Owen] *here*," suggesting she had no problem with his being killed elsewhere. (Emphasis added.) Second, she told Wheeles that it was *her* idea to burn Owen's items: "*I* said we have to burn it 'cause *I* don't need the evidence. *I* don't want to be tied to this." (Emphasis added.) Sharp was arrested only after making these additional statements. As a result, even assuming Wheeles did make a promise of leniency, substantial competent evidence exists to support a finding that the promise was a conditional one: conditioned upon Sharp not "jamming" herself with incriminations.

Sharp herself argues that Wheeles' purported promise of leniency is comparable to a promise, or grant, of immunity from prosecution. These, of course, can be conditional. In *People v. Kennedy,* 36 Cal. 4th 595, 115 P.3d 472 (2005), the court held that a grant of immunity from prosecution was conditioned on testimony being in conformity with an earlier statement to police. In a conditional grant of immunity case containing further parallels to the instant

one, a Tennessee court held that the grant was conditioned upon, among other things, the defendant later testifying truthfully, assisting in the investigation of the victim's murder, *and not having been the person who actually killed the victim. State v. Brooks*, 1998 WL 299267 (Tenn. Crim. App. 1998) (unpublished opinion).

The concept of conditional promises occurs throughout the criminal law. In addition to conditional grants of immunity from prosecution, the granting of pardons can be conditional. In *State v. Wolfer*, 53 Minn. 135, 138, 54 N.W. 1065 (1893), the defendant was pardoned on the condition that in the future he " 'take up his residence out of the state, and maintain the same outside of the state during the balance of his life.' " He later failed to abide by this condition and was taken into custody. The court observed:

"It is, of course, well settled that if a person be pardoned upon a condition, either precedent or subsequent, *which he neglects to perform*, the pardon is void, and he may be remanded to suffer his original sentence." (Emphasis added.) 53 Minn. at 138-39.

In Kansas, the granting of probation and parole and the entering into of plea bargains are also clearly based upon the defendant subsequently performing under the same type of conditional promise. See *State v. Walker*, 260 Kan. 803, 808, 926 P.2d 218 (1996) (a probationer may have his or her probation revoked, and conditional freedom ended, when he or she "has failed to comply with the conditions of probation"); *In re Tabor*, 173 Kan. 686, 250 P.2d 793 (1952) (upon violation of conditions of parole, court is authorized to revoke and cause the convict to be imprisoned under sentence as though no parole had been granted); *cf. State v. Branning*, 271 Kan. 877, 881, 26 P.3d 673 (2001) (in plea bargain, State agreed not to prosecute murder charge against accomplice on condition he pled guilty to aggravated robbery and aggravated burglary and testified truthfully in the codefendants' trials).

Here, any purported promise of immunity—Sharp's not going to jail—was clearly conditioned upon her not later doing something to "jam" or inculpate herself. See *Brooks*, 1998 WL 299267 at * 1 ("not having been the person who actually killed the victim").

*Promise to help Sharp and her kids*

Sharp also argues that part of her coercion, by promise of benefit, was Wheeles' statement that he would help her and her kids find a place to live. After he advised that he and Sharp would leave the interview to bring her kids from Baker's campsite back to the station and then return for the re-enactment scene, she asked if there was any way to "go to a battered women's shelter or something?" He replied, "We'll work out some place for you to go," and "[L]et me handle one thing at a time, but I promise we'll get that worked out." The earlier discussion regarding Wheeles' purported promises for Sharp's benefit applies here as well. After listening to defense counsel argue at the suppression hearing about this purported promise to find them living arrangements, the trial court nevertheless found that Sharp was not "operating under any promises." That factual finding is supported by substantial competent evidence.

Moreover, for this particular purported promise, substantial competent evidence exists to indicate there was no exchange of Sharp's statement for a place to stay. Instead, in this context considerable evidence indicates that rather than bargaining quid pro quo, Wheeles was merely trying to expeditiously rescue two small children who were left alone in a homeless camp with a registered sex offender, who reportedly had an outstanding arrest warrant for violating parole. See *State v. Farmer*, 285 Kan. 541, 554, 175 P.3d 221 (2008) ("[T]he detectives made no promise of leniency for Farmer's honesty. Although Detective Richstatter's comments 'be honest and help yourself' and 'the truth will set you free' may imply a benefit, when viewed in the totality of the circumstances, *the comments do not indicate any promises in return for Farmer's confession.*"); see also *Swanigan*, 279 Kan. at 40 (there must be a link between the coercive conduct of the State and the confession).

Additionally, the purported promise about helping the children concerns a collateral benefit. Accordingly, "a more stringent test is applied." *State v. Kanive*, 221 Kan. 34, 38, 558 P.2d 1075 (1976). As we stated in *State v. Holloman*, 240 Kan. 589, 597, 731 P.2d 294 (1987):

"A confession induced by a promise of a collateral benefit, *with no assurance of benefit to accused with respect to the crime under inquiry*, is generally considered voluntary and admissible in evidence, unless the circumstances surrounding the promise of the collateral benefit were such as to render the confession untrustworthy or the promise could reasonably be calculated to produce a confession irrespective of its truth or falsity." (Emphasis added.) (Quoting *State v. Churchill,* 231 Kan. 408, Syl. 1, 646 P.2d 1049 [1982]).

The *Holloman* court held that appellant did not contend he was ever promised any personal benefit if he confessed. Nor was there any contention the circumstances surrounding the alleged collateral benefit—that brother L.C. would be released from jail if defendant confessed—were such as to render the confession untrustworthy. 240 Kan. at 597.

Similarly, in *State v. Pittman,* 199 Kan. 591, 433 P.2d 550 (1967), there was evidence that the chief of police told the defendant during questioning that if he was holding back through fear of what would happen to his family, the chief would see that the proper authorities were contacted and the family would be cared for. This court held: "This is not the sort of promise, either in phraseology or content, which would overcome a defendant's free and unfettered will." 199 Kan. at 596; see also *Kanive,* 221 Kan. 34, Syl. ¶ 4 (promise by law enforcement was at most a promise of some collateral benefit, *i.e.,* to discontinue further investigation of the rape of defendant's grandmother; it assured no benefit to defendant concerning the crime under inquiry, *i.e.,* the murder).

### *Sharp was "particularly vulnerable"*

Finally, Sharp claims that her personal circumstances—"young, homeless, recently divorced, with two small children"—placed her in a "particularly vulnerable position." Without her elaboration, arguably these relate to her mental condition during the interview. See *Brown,* 285 Kan. 261. The trial court specifically found, however, that (1) "[a]t no time did she appear that she's under duress"; (2) "[a]t no time did it appear she was under duress, coercion, operating under any promises"; and (3) "she appears very relaxed [and] candid," "[h]er responses were very clear," "she was cooperative." These findings are supported by substantial competent

evidence, *e.g.*, the audio and visual recording of her interviews and re-enactment.

In sum, Sharp primarily alleges only one factor stated in *Brown* as bearing on the question of the voluntariness of her confession: unfairness of Wheeles in conducting the interview. That factor was in two parts: (1) promise of leniency/immunity, *i.e.*, no jail; and (2) promise to help her and her kids find a place to stay. She also makes general references to her "vulnerability." As mentioned, the trial court findings rejecting the presence of these factors are supported by substantial competent evidence.

The trial court also made findings regarding other factors in the "totality of circumstances" calculus for reviewing voluntariness. For example, it found that Sharp was *Mirandized*; she voluntarily gave up her *Miranda* rights; she did not appear to be under the influence of anything; the detention length was not unusual; she was given things to drink; and she was cooperative. Sharp does not argue on appeal that these findings are not supported by substantial competent evidence.

Accordingly, under the totality of the circumstances, Sharp has failed to establish that Wheeles' conduct unfairly deprived her of her free and independent will. Her statements were properly admitted at trial as voluntarily made.

Issue 2: *The trial court did not err in limiting the defense's cross-examination of a witness.*

Sharp next contends that the trial court erred by not allowing her to elicit during Cornell's cross-examination that in addition to the State's reduction in charges in return for his testimony, he also hoped to receive a downward departure sentence. The State counters that Sharp was given sufficient leeway, since her counsel was allowed to ask Cornell about his plea agreement with the State.

Like Sharp, Cornell was originally charged with felony murder and kidnapping. As the result of a plea agreement, Cornell agreed to testify against Sharp, and the State reduced the charges against him to involuntary manslaughter. At the time of trial, Cornell had not been sentenced.

In addition to establishing the plea bargain's reduced charges and their consequent lesser sentences in general, defense counsel sought to cross-examine Cornell on whether he would be requesting either a dispositional or durational departure at sentencing. The trial court barred the question:

"[Y]ou can't go into downward departures, durational departures. That's up to a Judge, that's not up to a jury. I'm not going to have the jury listen to that. They're trying Ms. Sharp, not Mr. Cornell. Mr. Cornell testified that he received a deal—that he went from first degree murder down to involuntary manslaughter."

*Standard of Review*

Our standard of review is for abuse of the trial court discretion:

" 'The credibility of an accomplice is subject to attack and great leeway should be accorded the defense in establishing the witness's subjective reason for testifying. [Citations omitted.] On the other hand, it lies within the sound discretion of the trial court to determine the propriety and scope of the examination and, absent a showing of a clear abuse of the exercise of the power of discretion, there is no prejudicial error. [Citations omitted.]' " *State v. Branning*, 271 Kan. 877, 882, 26 P.3d 673 (2001) (quoting *State v. Davis*, 237 Kan. 155, 157-58, 697 P.2d 1321 [1985]).

As the party who asserts abuse of discretion, Sharp bears the burden of showing it. *State v. Angelo*, 287 Kan. 262, 271, 197 P.3d 337 (2008).

*Discussion*

A synthesis of Kansas case law indicates that the trial court did not abuse its discretion. The case of *State v. Davis*, 237 Kan. 155, 697 P.2d 1321 (1985), provides guidance. There, codefendant Coty was originally charged with aggravated robbery but pled guilty to a reduced charge of attempted aggravated robbery. At Davis' trial, defense counsel sought to question Coty about the reasons he pled guilty, the plea negotiations, and the potential penalty he faced for the original and reduced charges. The State objected to questions about the penalties, arguing this would allow the jury to hear possible penalties for Davis if it found him guilty of the same original charge against Coty: aggravated robbery. The trial judge barred the questions:

"I would think that by allowing you to make a big deal about the reduction and what all the possible consequences and ramifications of that plea are, it takes away from the question in this case, and that is the innocence or guilt of your client, and puts in some information that the jury may or may not consider about the disposition of Mr. Coty's case." 237 Kan. at 157.

The *Davis* court found no abuse of trial court discretion in limiting Coty's examination. It pointed out that the jury was informed that Coty was charged as a codefendant and resolved his case through plea bargaining. Accordingly, the jury knew that Coty "had thereby avoided the risk of conviction of the more serious charge." 237 Kan. at 158. The court also cited its prior decisions holding that "inquiry into whether the witness was offered any 'arrangement or deal' by the State in exchange for his testimony is crucial." 237 Kan. at 158. Consistent with this case law, the court noted that defense counsel had been allowed to inquire whether Coty had made any such deal.

Similarly, 10 years later in *State v. Rinck*, 256 Kan. 848, 854, 888 P.2d 845 (1995), the defendant argued he should have been allowed to cross-examine a juvenile accomplice witness about the sentence he could have received if he had been tried as an adult. The court acknowledged that a proper and important function of the right to cross-examination is the exposure of the witness' motivation in testifying, but that the trial court has broad discretion in controlling the examination. 256 Kan. at 854. It observed that defendant Rinck was allowed to cross-examine the juvenile about his plea bargain and to point out that in exchange for his testimony the State had dropped one of the charges and agreed not to try him as an adult. Additionally, the witness acknowledged that his juvenile punishment was a "slap on the wrist" compared to an adult prosecution.

Finding *Davis* directly applicable, the *Rinck* court held that although defendant had been barred from questioning the witness about a sentence he could have received if tried as an adult, nevertheless he "was allowed reasonable latitude in inquiring as to the nature of the bargain he had made with the State." 256 Kan. at 855. Accordingly, there was no abuse of discretion.

Six years later, this court in *State v. Branning,* 271 Kan. 877, 26 P.2d 673 (2001), addressed defendant's argument that he should have been allowed to cross-examine his codefendant about his possible sentencing range under his plea agreement. He was allowed to elicit that the State dropped the murder charges in exchange for guilty pleas to aggravated robbery and aggravated burglary charges. The court noted that Branning had been allowed to go beyond the permitted inquiry in *Davis* to also question his codefendant as to any special sentencing arrangement that had been made. Citing *Davis* and *Rinck,* this court held the trial court did not abuse its discretion in limiting the cross-examination. 271 Kan. at 882.

Sharp cites several cases from other jurisdictions, but each is readily distinguishable. In *State v. Mizzell,* 349 S.C. 326, 563 S.E.2d 315 (2002), the witness had not yet reached a plea agreement with the prosecution—a situation in which the witness is much more likely to engage in biased testimony to please the prosecution. Similarly, in *Boone v. Paderick,* 541 F.2d 447, 451 (4th Cir. 1976), the court was discussing the testimony of witnesses who had yet to be charged or enter a plea agreement. By contrast, here Cornell had already entered into a plea agreement with the State and had only to be sentenced—a length not left up to the State, as the trial court correctly observed.

Here, the jury was informed that Cornell had originally been charged with kidnapping and felony murder, but in exchange for his testimony had pled guilty to a lesser charge: involuntary manslaughter. See *Davis,* 237 Kan. at 157-58 (inquiry into whether the witness was offered any " 'arrangement or deal' " by the State in exchange for his testimony is crucial; jury knew that through plea bargaining, codefendant had avoided the risk of conviction of the more serious charge). The jury was also informed Cornell generally would receive some sort of lesser sentence as a result. See *Rinck,* 256 Kan. at 855 (codefendant acknowledged that his juvenile punishment was a "slap on the wrist" compared to an adult prosecution). Contrast *Branning,* 271 Kan. 877 (within trial court discretion to deny questioning on possible sentencing range). Additionally, Sharp's jury was instructed to "consider with caution

the testimony of an accomplice" like Cornell pursuant to PIK Crim. 3d 52.18.

Under these circumstances, Sharp has not met her burden of showing the trial court abused its discretion in refusing her inquiry of Cornell about his hopes or requests for downward departures on a sentence for involuntary manslaughter.

**Issue 3:** *The trial court did not err in allowing into evidence statements from two coconspirators.*

Sharp next argues that three purported hearsay statements were improperly admitted into evidence. Specifically, Cornell testified that he overheard Hollingsworth tell Sharp that Owen was "probably dead by now" and that "he [Owen] was turning blue when we left." Hollingsworth did not testify at trial. Defense counsel objected, arguing that because neither of these two statements had been made outside Sharp's presence they could not qualify under the coconspirator's statement exception to the hearsay rule, K.S.A. 60-460(i)(2).

The third statement Sharp argues was improperly admitted is Cornell's testimony relating that Baker told him that Hollingsworth "had lynched [Owen]." Baker did not testify at trial. Defense counsel made no objection.

Each statement will be analyzed in turn, as not all share the same standards of review.

## Baker's Statement to Cornell

Because defense counsel made no objection to the admission of Cornell's testimony that Baker had told Cornell that Hollingsworth lynched Owen, we will not consider this issue on appeal. "As a general rule, a party must make a timely and specific objection to the admission of evidence in order to preserve the issue for appeal." *State v. Bryant*, 285 Kan. 970, Syl. ¶ 6, 179 P.3d 1122 (2008); see K.S.A. 60-404.

## Hollingsworth's statements to Sharp

Cornell testified about comments he heard Hollingsworth make to Sharp after Hollingsworth and Baker left Owen at the dike and returned to the camp:

"[Prosecutor]: Now, once [Charles Hollingsworth], [Carl Baker], and [David Owen] is [*sic*] taken from camp, how long are they gone?

"[Cornell]: Fifteen, no more than 20 minutes.

. . . .

"[Prosecutor]: Who came back to the camp?

"[Cornell]: [Hollingsworth] and [Baker].

"[Prosecutor]: Was [Owen] with them?

"[Cornell]: No.

. . . .

"[Prosecutor]: All right. What did [Sharp] ask them?

"[Cornell]: 'How's [Owen]?'

. . . .

"[Prosecutor]: What did [Hollingsworth] say?

"[Cornell]: Well, he looked at his—well, he didn't wear a watch, he was being facetious, I guess, *'Probably dead by now.'*

"[Prosecutor]: Did he say anything else when he said, 'He's probably dead by now?'

"[Cornell]: Yeah, he said, *'He was turnin' blue when we left.'* " (Emphasis added.)

Sharp argues there are five prerequisites to admittance of a coconspirator statement under K.S.A. 60-460(i)(2), including that the statement must be made "outside the presence" of the defendant. Repeating defense arguments at trial, Sharp claims since these italicized statements were made in her presence they should not have been admitted. The State responds that the judge's rejection of the "outside the presence of the defendant" requirement was well reasoned, supported by case law, and consistent with the statute.

Sharp does not argue that these statements were testimonial and therefore barred by the Confrontation Clause. See *State v. Jackson*, 280 Kan. 16, 34-35, 118 P.3d 1238 (2005) (Court in *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 [2004], specifically noted that statements by coconspirators are not testimonial). Nor does she claim that they are anything but hearsay. Rather, the disagreement between the parties focuses on whether "outside the presence" is an element required under K.S.A. 60-460(i)(2). Accordingly, our review of this issue is de novo. See *State v. White*, 279 Kan. 326, 331, 109 P.3d 1199 (2005) (review is de

novo of evidence admissibility decision when interpreting statute and determining if judicial discretion was guided by erroneous legal conclusions).

The hearsay statute, K.S.A. 60-460, states in relevant part at subsection (i)(2):

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:

. . . .

"(i) Vicarious admissions. As against a party, a statement which would be admissible if made by the declarant at the hearing if . . . (2) the party and the declarant were participating in a plan to commit a crime or civil wrong and the statement was relevant to the plan or its subject matter and was made while the plan was in existence and before its complete execution or other termination."

Sharp acknowledges that the "outside the presence of the accused" element does not appear in the statute. Nevertheless, she relies upon *State v. Bird*, 238 Kan. 160, 175-76, 708 P.2d 946 (1985), where this court stated:

"This exception to the rule against admitting hearsay establishes five prerequisites to its application: (1) the person testifying must be a third party; (2) the out-of-court statement about which the person will testify must have been made by one of the coconspirators; *(3) the statement of the coconspirator must have been outside the presence of the accused;* (4) the statement of the coconspirator must have been made while the conspiracy was in progress; and (5) the statement must be relevant to the plan or its subject matter." (Emphasis added.)

*Bird* cites no authority for this proposition. We independently observe, however, that this uncited requirement also appeared in *State v. Roberts*, 223 Kan. 49, 574 P.2d 164 (1977). There, defendants attempted to keep a witness from testifying about what she had heard in the presence of conspirators. The court stated:

"Appellants have misinterpreted the statute and its case law. K.S.A. 60-460(i) addresses a third party situation. Its requirements apply when the party (defendant) and the declarant (coconspirator) are participating in a plan to commit a crime and a third person (witness) is later called to testify as to the coconspirator's statements *made outside the presence of the defendant* concerning the conspiracy for the purpose of establishing defendant's participation in the conspiracy and crime." (Emphasis added.) *Roberts*, 223 Kan. at 60.

As in *Bird*, the *Roberts* court cited no authority for the "outside the presence of the defendant" requirement. Regardless, the court held that the hearsay exception in K.S.A. 60-460(i)(2) did not apply because the "statements here were made in the presence of all conspirators. The statements were not made to a third party." 223 Kan. at 60. The court then explained that the testimony was nevertheless admissible for another reason:

"[S]tatements of persons present when the conspiracy is being consummated are admissible as matters accompanying an incident to the transaction or event; as such they are part of the res gestae. Such statements by which the agreement was reached may be established by the testimony of anyone present when the agreement was alleged to have been entered into." 223 Kan. at 60.

Obviously, there is "no outside the presence of the defendant" requirement on the face of the statute. Additionally, the doctrine relied upon by the *Roberts* court to actually admit the evidence—res gestae instead of K.S.A. 60-460(i)(2)—has now been interred in Kansas. See *State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006). Finally, we observe that numerous Kansas decisions since *Roberts* have not even mentioned the "outside the presence of defendant" requirement. See *State v. Nguyen*, 281 Kan. 702, 715-16, 133 P.3d 1259 (2006); *State v. Jackson*, 280 Kan. 16, 33-35, 118 P.3d 1238 (2005); *State v. Sherry*, 233 Kan. 920, 933-34, 667 P.2d 367 (1983). Contra *State v. Flynn*, 274 Kan. 473, 509, 55 P.3d 324 (2002).

For these reasons, this requirement articulated in *Roberts* and reiterated by its progeny is expressly disapproved.

Sharp asserts that this court should consider two other reasons not expressly argued at the trial level to brand these statements as inadmissible hearsay. First, she contends that the statements did not relate to the plan or subject matter of the conspiracy. Second, she argues that the statements were made after the termination of the conspiracy. Sharp acknowledges that the contemporaneous objection rule would typically bar consideration of her arguments but contends it should be waived in order to protect her confrontation rights.

The State responds there is no reason to waive the contemporaneous objection rule, but the statements are admissible under the exception anyway.

We have held that a defendant's failure to timely object at trial to alleged hearsay statements precludes raising the issue on appeal, even where contending a violation of the Confrontation Clause of the Sixth Amendment to the United States Constitution. *State v. Mays*, 277 Kan. 359, 384-85, 85 P.3d 1208 (2004). Moreover, it is well established that a party " 'cannot object to the introduction of evidence on one ground at trial and then assert another ground on appeal.' " *State v. Engelhardt*, 280 Kan. 113, 127, 119 P.3d 1148 (2005). Accordingly, Sharp's failure to object on these particular bases typically would bar our consideration on appeal.

However, because of Sharp's understandable and sole reliance at trial upon a longstanding line of Kansas cases which today we disapprove, and because of the involvement of a fundamental right—confrontation—we will consider her alternate arguments. See *State v. Shopteese*, 283 Kan. 331, 339, 153 P.3d 1208 (2007) (consideration necessary to serve ends of justice or prevent denial of fundamental rights). On these argued bases, our review of the court's ruling is for abuse of discretion. *State v. Brown*, 285 Kan. 261, 294, 173 P.3d 612 (2007) (generally, an appellate court reviews a trial court's determination that hearsay is admissible under a statutory exception for abuse of discretion).

*Statements relating to plan or subject matter of conspiracy*

Sharp does not dispute the existence of a conspiracy. Rather, she argues that the State merely established to the trial court's satisfaction a conspiracy to kidnap; and Hollingsworth's two statements instead relate entirely to a conspiracy to kill. The State responds that the kidnapping and murder were a single continuing conspiracy. Specifically, "the murder occurred during the commission of the kidnapping and was a means of concealing the kidnapping." We generally agree with the State.

There need not be any formal agreement to constitute a conspiracy. "[I]t is enough if the parties tacitly come to an understanding in regard to the unlawful purpose, and this may be inferred from sufficiently significant circumstances." *State v. Swafford*, 257 Kan. 1023, 1040, 897 P.2d 1027 (1995). Sharp admitted Hollingsworth told her to get a rope, and she told Cornell to get one for

tying up Owen. More important, she also told Wheeles that she had told Hollingsworth—when she was afraid he was going to chop up Owen—"Don't kill him here." The admission suggests she approved of his being killed elsewhere. She further admitted it was her idea to burn Owen's possessions because "I don't want to be tied to this." Accordingly, it can be inferred that "this" was Owen's death, and not merely his kidnapping. Indeed, burning the possessions of a dead man in order to prevent ties to his death makes more sense than burning the notebooks and cell phones of a live man to prevent permanent detection of his kidnapping. Additionally, evidence indicates that Sharp helped burn after Hollingsworth said Owen was "probably dead" and "turning blue." Specifically, although different from Sharp's statement to Wheeles, she testified at trial that Hollingsworth told her that Owen's shoes, socks, and glasses were burned after Hollingsworth and Baker returned from dragging Owen toward the dike, *i.e.*, after Hollingsworth's hearsay statements were made.

As the State suggests, we have held that "a conspiracy is not terminated when an attempt to conceal the offense is made." *State v. Campbell*, 210 Kan. 265, 277, 500 P.2d 21 (1972). Therefore, a conspiracy exists "to the disposition of its fruits, and to acts done to preserve its concealment." *Campbell*, 210 Kan. at 277 (citing *State v. Borserine*, 184 Kan. 405, 411, 337 P.2d 697 [1959]). It can be inferred from the evidence that Hollingsworth killed Owen because Hollingsworth wanted to stop him from reporting the crimes already committed against him, *e.g.*, the kidnapping and battery. It can also be inferred from the evidence that Baker, as a sex offender purportedly on parole with an outstanding arrest warrant, similarly did not want Owen to be able to contact the authorities after his forcible restraint, which had originally been performed to prevent Owen from calling the police. Consequently, even if, as Sharp contends, she could have only conspired to kidnap—which conspiracy arguably ended with Owen's death—it can be established that she also participated in the conspiracy to kill, by helping burn Owen's possessions after Hollingsworth's statements. In short, she likely knew the kidnapping victim was dead, and she was helping cover up that crime.

Hollingworth's two statements meet the requirement of relating to the subject matter of the conspiracy to commit kidnapping—and resultant murder—because they clearly concern the physical status of the kidnapped victim: "turning blue" and "probably dead."

*Termination of conspiracy*

Sharp next argues that the statements are not admissible because the conspiracy had terminated before they were made. See *State v. Nguyen*, 281 Kan. 702, 716, 133 P.3d 1259 (2006); K.S.A. 60-460(i). We again observe that a conspiracy is not terminated when an attempt to conceal the offense is made and a conspiracy exists to acts done to preserve its concealment. Here, Hollingsworth's comments were made as he and Baker were entering the camp after taking Owen to the dike and tying him up. Sharp testified that Hollingsworth told her that Owen's shoes, socks, and glasses were burned after this point, *i.e.*, to conceal the crime. Accordingly, the conspiracy had not yet ended when Hollingsworth told her that Owen was turning blue and was probably dead.

Issue 4: *Cumulative error did not deny Sharp a fair trial.*

Sharp finally argues that cumulative error requires reversal of her conviction and remand for a new trial. Because we have found no error, none can accumulate. See *State v. Mays*, 277 Kan. 359, 385, 85 P.3d 1208 (2004).

The convictions are affirmed.

JOHNSON, J.: dissenting: I respectfully dissent from the majority's determination that all of Sharp's statements were the product of her free and independent will.

The majority emphasizes that we are to afford great deference to the district court's factual findings. However, I do not discern that the facts are really in dispute; we know precisely what was said and how it was said. I can even accept the proffered reasons for why it was said; the overall tenor of the interrogation certainly suggests that Detective Wheeles truly believed that Sharp was a witness, rather than a suspect, and that his motive in making prom-

ises to Sharp was to obtain a true account of what had happened, rather than to coerce a confession. However, I do not believe that the detective's subjective reasons for making promises should determine the *legal effect* of what was actually said to the defendant. We should look at the interrogation from the objective viewpoint of the defendant, *i.e.*, would a reasonable person have been induced to make a statement by the detective's promises or assurances.

Here, anyone in Sharp's situation would have understood that the detective was promising that she was not going to jail "as long as [she did] not do something dumb and jam [herself]." Conditional or not, a promise was clearly made. That promise was followed immediately with an example of how Sharp could help herself, *i.e.*, by explaining that she was scared when she did what she did. Then, the detective explicitly instructed Sharp on how to avoid jamming herself: "Just don't tell me no if I ask you something."

What subsequently transpired must be viewed in that context. Sharp volunteered that she told Hollingsworth, "don't kill him." The detective then offered the alternative statement, "don't kill him here." Consistent with the earlier suggestion that Sharp should follow the detective's lead, she did not tell him "no," but rather she accepted the proffered alternative. From the totality of the circumstances, I cannot find that the amended statement was the product of Sharp's free and independent will.

Finally, I want to briefly address the majority's declaration that "the purported promise about helping the children concerns a collateral benefit." First, Sharp's question about going to a battered women's shelter indicates that she intended to accompany the children and would be a direct beneficiary of the promise to make such arrangements. More importantly, however, I simply do not accept the premise that a promise to take care of one's homeless children is to be assessed as less inducive or coercive than a promise of leniency in charging the crime being investigated. For many, if not most, parents, a promise to provide safety for their children would be most compelling. I would not relegate it to a lesser class of promises.