IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 121,715

STATE OF KANSAS,
*Appellee*,

v.

HEIDI L. HILLARD,
*Appellant*.

SYLLABUS BY THE COURT

1.

A district court's decision to limit cross-examination is reviewed for abuse of discretion.

2.

To preserve for review an issue involving a district court's allegedly erroneous admission or exclusion of evidence, the general rule under Kansas law requires a party to raise a contemporaneous objection. For issues involving the allegedly erroneous exclusion of evidence, a proffer as to the substance of the excluded evidence is also required.

3.

Constitutional issues cannot generally be raised for the first time on appeal. While there are exceptions to this rule, the decision to review an issue raised for the first time on appeal is prudential.

4.

Generally, a codefendant's objection to the admission or exclusion of evidence is only preserved for that codefendant's own appeal; other codefendants must individually join in the objection to preserve it for their own appeals.

5.

Although a prosecutor is given wide latitude in crafting closing arguments, a prosecutor commits prosecutorial error by misstating the law.

6.

To sustain a conviction for premeditated first-degree murder, the prosecution must prove that death was the defendant's prospective, intended result of the defendant's actions.

7.

In considering a challenge to jury instructions, the presence or absence of a party's contemporaneous objection affects the court's consideration of harmlessness. Where a party does not contemporaneously object to a jury instruction, the instruction is reviewed for clear error. Additionally, where the basis of an objection to a jury instruction at trial differs from the basis argued on appeal, appellate courts review a jury instruction for clear error.

8.

When discussing jury instructions, a prosecutor generally does not misstate the law by telling jurors to move on to consideration of lesser included offenses only if they do not agree or if they do not find the defendant guilty of the greater offense.

9.

To convict a defendant of distribution of a controlled substance under K.S.A. 2020 Supp. 21-5705(a), the prosecution must present sufficient evidence of possession as a necessary part of the crime. But the mere acquisition of a controlled substance, without more, is insufficient to find the recipient guilty of distribution.

10.

The agreement to receive a controlled substance, without more, is insufficient to support a conviction for conspiracy to distribute a controlled substance.

11.

A district court's decision as to whether the probative value of evidence is outweighed by substantial risk of undue prejudice is reviewed on appeal for abuse of discretion.

12.

When a statute's language is unambiguous, a court need not resort to the canons of construction to interpret its meaning.

Appeal from Sedgwick District Court; BRUCE C. BROWN, judge. Opinion filed July 23, 2021. Affirmed in part and reversed in part.

*Reid T. Nelson,* of Capital and Conflicts Appeals Office, argued the cause, and *Debra J. Wilson*, of the same office, was with him on the briefs for appellant.

*Lance J. Gillett*, assistant district attorney, argued the cause, and *Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

WILSON, J.: Following a failed drug deal, Heidi L. Hillard—along with several other codefendants—participated in events over the course of November 5-6, 2016, that involved the kidnapping and rape of S.S. and culminated in the murder of S.S.'s boyfriend, Scott "Scottie" Goodpaster Jr. After a joint jury trial with her husband, Jeff Hillard, Hillard was convicted of premeditated first-degree murder, felony murder (in the alternative), two counts of aggravated kidnapping, aggravated battery, conspiracy to distribute a controlled substance, and rape.

Hillard has directly appealed, raising eight issues for our consideration. We agree that the State presented insufficient evidence to support Hillard's conviction for conspiracy to distribute a controlled substance and reverse that conviction. Finding no other errors, we otherwise affirm the district court.

FACTUAL AND PROCEDURAL HISTORY

Jeff and Hillard lived with her children on property that had a house and a shed, along with other outbuildings. The property was covered by several security cameras.

Brian Bussart had also been living with the Hillards for a few months by the beginning of November 2016. Bussart did not pay the Hillards rent; instead, he ran errands for them. For his part in the events of November 5-6, Bussart would ultimately plead guilty to first-degree felony murder in exchange for the dismissal of other charges, including premeditated first-degree murder. He hoped to obtain leniency by entering this deal, although he had not yet been sentenced as of the time of the Hillards' trial.

4

Willie Earl Morris was also involved in these events. Morris did not testify in the Hillards' trial, and his relationship to the others was left somewhat nebulous for the jury. Morris' separate jury trial ultimately resulted in several convictions, including one for premeditated first-degree murder. We affirmed these convictions, albeit on different issues than are presented here. *State v. Morris*, 311 Kan. 483, 484, 463 P.3d 417 (2020).

Alexandria Scott would ultimately plead guilty to kidnapping and aggravated robbery for her part in these crimes. Scott had known S.S. for roughly a year and a half before the events, but she had only met most of the other individuals involved less than a week before. At Goodpaster's urging, Scott had recently participated in an unsuccessful attempt to recoup $600 owed to Hillard by an unrelated individual. This individual was supposed to supply an ounce of methamphetamine in exchange for the money but failed to deliver. According to Bussart, the Hillards were unsuccessful in recovering all their money. Additionally, Scott was a "really good friend" of Andrew Cummings, who was a drug dealer.

The precise relationship between Goodpaster and the Hillards is also somewhat unclear, although he had been involved in the previous week's failed $600 deal. S.S.— who had been Goodpaster's girlfriend for about a month—did not know the Hillards at all. Like many others involved in this case, S.S. was addicted to methamphetamine. At trial, the defense explored S.S.'s credibility at some length and through various angles. Ultimately, the State never charged S.S. with any crimes in connection with the events of this case.

After their previous attempt to obtain methamphetamine failed, the Hillards again tried to acquire an ounce of methamphetamine through Goodpaster on November 5. As part of the purchase price, the Hillards provided Goodpaster with $185. The rest of the price was to come from a pistol supplied by a friend of Goodpaster. When Bussart

5

contacted Goodpaster to inquire about the transaction, Goodpaster informed him that he had paid his rent at the hotel with a portion of the money, then given the rest to Cummings for an ounce of methamphetamine.

As they had in the case of the failed $600 deal, the Hillards enlisted the services of Morris, Bussart, and Scott in an effort to settle matters. When Cummings could not be found, Scott suggested that the group visit Goodpaster at the Executive Inn, where she knew him to be staying. Once there, Hillard directed Jeff, Bussart, and Morris to go to Goodpaster's room; but Hillard soon decided to follow. She asked Scott to go as backup, providing her with a set of brass knuckles in addition to the knife Scott already carried. Hillard was armed with a taser.

In the hotel room, the group found Goodpaster and S.S. and began discussing the missing money. When Scott attempted to contact Cummings about the methamphetamine, Cummings informed her that he had been pulled over and would be going to jail. If that were true, which some of them doubted, any methamphetamine he had would be seized.

For several possible reasons—including Scott's suggestion that S.S. might be an undercover police officer, that S.S. should be searched for a "wire," and that the whole exercise might be a setup—the group's suspicions quickly fell on S.S., who was evasive, defensive, and/or argumentative in response to their questioning. Accounts vary as to the level of verbal and physical abuse heaped upon S.S. in the hotel room.

The group remained in the hotel room for a couple of hours, but they only found frustration. Eventually, Hillard told everyone to "take a ride to cool off," so the group left sometime between 2:15 and 2:30 a.m. on the morning of November 6. S.S. did not want to leave with them but was surrounded and outnumbered; she did not scream because

Hillard threatened her with a knife, saying "that if I acted like anything was happening . . . I would get hurt." It is somewhat less clear whether Goodpaster also went willingly, but he went along nevertheless.

Goodpaster, Bussart, and Morris boarded a white truck, while Scott, the Hillards, and S.S. got into the group's other vehicle, an Equinox SUV. At Scott's request, the group dropped her off at a friend's house. Before departing, however, Scott obtained a white T-shirt for Hillard to use as a blindfold on S.S.

According to S.S., after Scott departed, Hillard tied S.S.'s hands behind her back and blindfolded her. During the ensuing drive, Hillard continued to demand S.S. "tell us the truth" while repeatedly tasing her. Hillard's questioning centered on her belief that Goodpaster and/or S.S. were trying to set the Hillards up in some way. When the SUV finally stopped, Jeff leaned into the back seat and one of the Hillards wrapped a cord or rope around S.S.'s neck. Then one of the Hillards—S.S. presumed it was Jeff—pulled her pants down and "put the taser inside me and tased me" several times "[i]nside my vagina area."

After that, S.S. told the Hillards that Goodpaster and another man were going to set them up so that law enforcement would get involved. S.S. claimed later that the story was false, but that she said it in order to stop the Hillards from hurting her further. The Hillards ultimately brought the still-blindfolded S.S. to the shed on their property and tied her arms to a chair with zip ties.

Meanwhile, Bussart, Morris, and Goodpaster were passing the time. After they arrived at the Hillards' property around 4:00 a.m., they got high on methamphetamine. Afterwards, they went inside and ate; Bussart apparently took a shower and a nap, while Morris and Goodpaster chatted. Eventually, Bussart noticed that the Equinox had

7

returned, so he went to investigate. In the shed, Bussart found that the Hillards had S.S. blindfolded and sitting in a chair. As Bussart arrived, Hillard commanded S.S. to tell him that she and Goodpaster "had a plan to call DCF on the kids and call the police on the drugs" and then rob the residence once the Hillards were in jail. The Hillards then ordered Bussart to bring Goodpaster to the shed.

Once he arrived at the shed, Goodpaster was eventually forced to sit in a chair. Following an attempt to escape, he was zip-tied to the chair. Goodpaster repeatedly denied the existence of any plan to do the Hillards ill. Accounts vary of the ordeal that followed, but, generally, the evidence suggested that Hillard grew angry at Goodpaster's repeated denials and—with the aid of Jeff and Morris—began to torture him. Hillard cut into Goodpaster's earlobe and sliced his shorts open with a knife, threatening to remove one of his testicles while he screamed. (Jeff's iPhone recorded the audio of a roughly 80-minute portion of this interrogation, as discussed below.) The group then beat Goodpaster with a variety of improvised weapons, inserted cuticle sticks into his ears, strangled him with an extension cord, and attached a car battery—via jumper cables—to his nipples (although the battery turned out to be dead). According to S.S., Hillard said that "if he didn't tell her what was really going on, that they would eventually hang him." Bussart also recalled that someone mentioned hanging Goodpaster—possibly as a joke—but he claimed he was not paying attention.

The interrogation went on for hours, with the physical violence lasting between 60 and 90 minutes. At about 9:54 a.m., the Hillards' security system recorded Jeff leaving the shed to start up his motorcycle, ostensibly to drown out Goodpaster's screams. Shortly later, Bussart left the premises to procure some cigarettes. By that point, he had observed Goodpaster being either hit, cut, or threatened with the following items:  a taser, fists,

8

battery cables, an ax, a paint sprayer, and a knife. S.S. herself had hit Goodpaster at least once with a wooden stick, though she claimed it was done only to convince the Hillards that she "was on their side" because she "didn't want to get killed." During the beating, Goodpaster begged for his life and asked to see his son one last time. In Bussart's view, Goodpaster believed that he was about to die.

At about 10:26 a.m., Goodpaster tried to escape by jumping through the shed's glass window. He was quickly subdued by Jeff and Morris, who continued to strike him. S.S. kicked Goodpaster "a couple times" to keep the group's wrath directed away from herself. When Bussart drove up to the property shortly thereafter, S.S. gestured for him to pull over to where Goodpaster lay. Hillard then ordered Bussart and S.S. to retrieve tape and a staple gun from the garage; after S.S. returned, someone tried to staple Goodpaster's mouth shut. Jeff then held Goodpaster down while Morris tried to tape his mouth shut; someone may have also stuffed a gag inside his mouth. Goodpaster was still alive, but it appeared he was starting to have difficulty breathing. S.S. testified that, at some point, someone struck Goodpaster in the nose with a blowtorch, which caused his nose to bleed, although Bussart denied this.

Using a rope provided by Jeff—which was already tied like a noose—Bussart tied Goodpaster's legs. The three men then placed the still-bleeding Goodpaster in the truck. Once he was on the floorboards of the back seat of the truck, Goodpaster was no longer resisting. Morris got in the back seat, Bussart sat in the front passenger seat, and Jeff drove. According to S.S., someone—either Morris, Bussart, or Jeff—said that they would "clean [Goodpaster] up and take care of him." Goodpaster was still breathing and making noise as the truck departed.

9

The group discussed options to dispose of Goodpaster's body as they drove, although Bussart could still hear Goodpaster breathing at least until the truck reached Broadway. Bussart thought Goodpaster was dead after that point, though he was not sure—nor was certain he could have heard Goodpaster over the noise of the road, since he was sitting in the front seat.

After about an hour in total of driving the back roads, the group found an open gate. They then drove to a tree line, got out, and dragged Goodpaster to a creek. On Jeff's orders, Bussart removed the rope from Goodpaster's feet and placed it around his neck; Jeff then threw the rope over a tree branch and hanged him. According to Bussart, no one checked to see whether Goodpaster was dead or alive by this point, although he expressed uncertainty as to why anyone would hang a dead man. Nevertheless, Bussart saw no signs of life from Goodpaster by the time they stopped and was "sure" he was dead. After attempting to clean themselves and the truck, they then left.

After the men left with Goodpaster, Hillard eventually led S.S. back into the house, where she remained until the police arrived some time later. When police arrived, S.S. asked Hillard for a place to hide. Hillard suggested the closet, which is where officers ultimately found her. S.S. initially gave the police a fake name, date of birth, and social security number because she "was on the run from" a residential facility as part of her probation in another case.

While police were at the Hillards' home, Jeff arrived, driving the truck. Jeff was placed under arrest, and the truck was secured for further examination. Investigators who searched the premises then found, photographed, and collected numerous items that appeared to be connected with foul play, both in the Hillards' shed and at a spot in the yard that held both a wagon and a "formidable" amount of blood. Investigators also found

a pair of iPhones—including one, eventually determined to be Jeff's, that contained three audio recordings of various portions of the day's events.

Officers finally located Goodpaster's body in rural Harvey County on November 12, hanging from a tree with a rope looped around his neck. A subsequent autopsy performed by Dr. Ronald Distefano documented numerous superficial injuries across Goodpaster's body. Dr. Distefano's ultimate medical opinion, based largely on the presence of the rope around Goodpaster's neck, was that Goodpaster had been killed by asphyxiation from hanging, although he admitted that positional asphyxia could have also killed Goodpaster.

The State charged Hillard with premeditated first-degree murder of Goodpaster (Count One) or, alternatively, felony murder (Count Two), based on an underlying felony of aggravated kidnapping (Count Three); aggravated battery (Count Four); and conspiracy to distribute a controlled substance (Count Five). She was also charged with aggravated kidnapping (Count Six), aggravated robbery (Count Seven), and rape (Count Eight) with respect to her conduct against S.S. Following a preliminary hearing, Hillard was bound over on all charges.

Hillard's case proceeded to a joint jury trial alongside Jeff. During closing arguments, the prosecution made several comments that Hillard now challenges as prosecutorial error; we will discuss those, and other trial objections, in more detail below. The jury ultimately returned guilty verdicts against Hillard on all counts except for the aggravated robbery, and the district court subsequently sentenced Hillard. Hillard then appealed.

ANALYSIS

*Hillard failed to preserve an objection to the district court's limitation of cross-examination of S.S.'s potential charges or sentences. Additionally, the district court did not abuse its discretion in limiting cross-examination of Bussart.*

Hillard first argues that the district court violated her Sixth Amendment right of confrontation by limiting cross-examination of S.S. as to the possible charges she was avoiding by testifying. She also claims that the district court committed an error of law by preventing the jury from learning about the prison sentences S.S. and Bussart avoided by testifying. We address these two arguments together.

*Standard of Review*

"Because a district court may exercise reasonable control over the scope of cross-examination, appellate courts review the court's decision to limit cross-examination for an abuse of discretion. A district court abuses its discretion when (1) no reasonable person would have taken the view adopted by the district court; (2) the judicial action is based on an error of law; or (3) the judicial action is based on an error of fact. [Citations omitted.]" *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 (2018).

The party challenging the district court's exercise of discretion bears the burden of establishing it has been abused. 307 Kan. at 739. Moreover, "[t]he right to cross-examine . . . is not absolute. In certain circumstances it must 'bow to accommodate other legitimate interests in the criminal trial process.'" 307 Kan. at 738 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S. Ct. 1038, 35 L. Ed. 2d 297 [1973]).

*Additional Facts*

During the Hillards' joint jury trial, the district court expressly ruled that the defense could "inquire fully on plea bargains" but that there could be "no discussion of . . . the penalty range . . . no specific reference to the specific penalties or—that charges carry or the specific penalties that they're supposed to get." But the district court explicitly permitted defense counsel "to ask [witnesses], so you are anticipating that by your testimony today you will be granted leniency at your disposition hearing?"

While the prosecutor observed that the district court's ruling addressed all issues involving Scott and Bussart, he asserted that there was no agreement between S.S. and the State. Jeff's counsel expressed disbelief that the State had not made any deal with S.S., describing it as a "wink wink sorta situation where, you know, you come in and you testify for us and don't worry about it, we're not going to charge you." The prosecutor again represented to the court that no such unwritten deal existed. Ultimately, the court ruled that "there needs to be a good faith basis" to inquire about any agreement between the State and S.S.

*Preservation*

Only Jeff's counsel objected to the district court's limitation of S.S.'s cross-examination; Hillard's attorneys did not join in this objection. Nor was there any proffer made as to what, if anything, this line of questioning would have uncovered. Hillard concedes that her attorneys did not join in Jeff's counsel's objection but asks the court to review her argument for the first time on appeal to protect her fundamental right to cross-examination. We decline to do so.

As a procedural bar to appellate review, our statutes generally require contemporaneous objections to issues involving the erroneous admission or exclusion of evidence. K.S.A. 60-404; *State v. Raschke*, 289 Kan. 911, 913, 219 P.3d 481 (2009). Additionally, in the case of an allegedly erroneous exclusion of evidence, K.S.A. 60-405 requires the objecting party to proffer the substance of that evidence to the district court in order "to make an adequate record of the evidence to be introduced." *State v. Evans*, 275 Kan. 95, 99, 62 P.3d 220 (2003).

Without a contemporaneous objection, constitutional issues cannot generally be raised for the first time on appeal. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). We have recognized some exceptions to this general rule, including situations where consideration of an issue is necessary to protect fundamental rights. *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 (2010). But "[t]he decision to review an unpreserved claim under an exception is a prudential one" and "[e]ven if an exception would support a decision to review a new claim, we have no obligation to do so." *State v. Gray*, 311 Kan. 164, 170, 459 P.3d 165 (2020).

Hillard correctly asserts that the right of cross-examination under the Confrontation Clause of the Sixth Amendment to the United States Constitution is fundamental. E.g., *State v. Montanez*, 215 Kan. 67, 69, 523 P.2d 410 (1974). "In recent years, however, we have consistently been refusing to review an evidentiary issue without a timely and specific objection even if the issue involves a fundamental right." *Dukes*, 290 Kan. at 488; see *State v. Levy*, 292 Kan. 379, 386, 253 P.3d 341 (2011).

Although her own attorneys did not object to the district court's ruling concerning the cross-examination of S.S., Hillard correctly notes that Jeff's counsel did. This does not impact our analysis, however. Under our caselaw, a codefendant's objection is only preserved for that codefendant's own appeal; other codefendants must individually join in

the objection to preserve it for their own appeals. See, e.g., *State v. Yardley*, 267 Kan. 37, 40, 978 P.2d 886 (1999); *State v. Harris*, 266 Kan. 270, 279, 970 P.2d 519 (1998). We decline Hillard's invitation to depart from this requirement here.

Fundamentally, there are good reasons that statutes and caselaw require an objection and a proffer upon exclusion of evidence at trial. First, the lack of an objection may be tactical. An appellate court would have great difficulty ascertaining whether that is the case. Second, without a proffer—which, in this case may have required that counsel be appointed to represent S.S.—an appellate court is left to guess what may have been established and whether it would have sufficed to justify sustaining the objection. As we have previously observed, "Failure to make a proffer of excluded evidence precludes appellate review because there is no basis to consider whether the trial court abused its discretion." *Evans*, 275 Kan. at 100. Thus, we conclude that Hillard has failed to preserve her claim of error as to the district court's limitation precluding the exploration of any charges S.S. ostensibly avoided by testifying, and we decline to apply an exception to the general rule requiring a contemporaneous objection to consider this issue.

As to Hillard's second claim, her trial counsel did contemporaneously object to the district court's ruling preventing cross-examination on the specific sentence benefits received by witnesses who struck plea bargains with the State. But this objection extended only to individuals who had made or discussed such deals, such as Bussart. S.S. never discussed—much less entered into—a plea bargain with the State, and thus was not the subject of this portion of the parties' discussion with the district court. Consequently, we only reach the merits of this argument with respect to Bussart; as to S.S., it was not preserved.

15

*Merits*

Hillard argues that the sole prohibition imposed by the district court with regard to the cross-examination of Bussart—i.e., that the defense could not inquire as to the specific sentence reduction he received as part of his plea bargain—constituted a "highly prejudicial" error that prevented the jury from effectively gauging Bussart's credibility. Hillard acknowledges contrary rulings in *State v. Sharp*, 289 Kan. 72, 97-100, 210 P.3d 590 (2009), and *State v. Davis*, 237 Kan. 155, 158, 697 P.2d 1321 (1985). She nevertheless attempts to distinguish these cases because a requested curative jury instruction could have neutralized any risk that the jury would consider the Hillards' punishments if it learned of Bussart's possible sentences.

We are unpersuaded. First, we are unable to divine what legal rule the district court supposedly applied incorrectly in imposing this limitation. Second, we note that the scope of cross-examination permitted by the district court very closely mirrored that in *Sharp*, 289 Kan. at 99. Within that limitation, Jeff's counsel cross-examined Bussart about his plea deal. The jury learned the details of Bussart's plea, learned that Bussart hoped to obtain leniency in exchange for his testimony, and learned that he had not yet been sentenced. While the jury may not have appreciated the precise numerical importance of Bussart's ability to plead guilty to felony murder—and thus face a parole board after only 25 years, instead of 50—they were well aware that his other charges were dropped. Moreover, as in *Sharp*, the district court also gave the jury a cautionary instruction, warning it to "consider with caution the testimony of an accomplice." See 289 Kan. at 99-100. Thus, we cannot conclude that no reasonable person would have imposed the same restriction. The district court did not abuse its discretion by placing these limits on Hillard's cross-examination of Bussart.

16

*The prosecutor did not misstate the law during closing arguments.*

During closing arguments, the prosecutor told the jury:

"It was not intended for [Goodpaster] to survive that trip and he did not. What if [Goodpaster] did die sooner than intended, that [Goodpaster] may have died before he could be killed by hanging is not a defense. Again, if they had formed the intent to kill him and they had committed acts that led to his death, then they are responsible for his death."

Hillard alleges that the prosecutor's statements misstated the law by divorcing the element of intent from the acts that specifically led to Goodpaster's death. This was critical, Hillard alleges, because as an aider and abettor, she could only be criminally responsible for the principal actor's conduct; if Goodpaster's death was the result of mere recklessness, she argues, she cannot be liable for premeditated murder. In particular, she characterizes the acts surrounding the gagging of Goodpaster as potentially "reckless or negligent conduct" on behalf of the principal actor(s), which would excuse her of premeditated conduct as an aider and abettor.

*Standard of Review*

A claim of prosecutorial error generally may be preserved even without a contemporaneous objection, "'although the presence or absence of an objection may figure into our analysis of the alleged [error].'" *State v. Sean*, 306 Kan. 963, 974, 399 P.3d 168 (2017) (quoting *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 [2009]). We review claims of prosecutorial error under a two-step analysis:

"[T]he appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to

17

obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman*. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016) (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011]).

This "wide latitude" extends to alleged errors made in closing arguments. *State v. Tahah*, 302 Kan. 783, 787, 358 P.3d 819 (2015). In determining whether a particular statement falls outside of the wide latitude given to prosecutors, the court considers the context in which the statement was made, rather than analyzing the statement in isolation. *Thomas*, 307 Kan. at 744. In crafting closing arguments, a prosecutor is permitted to discuss the evidence and draw "'"reasonable inferences from that evidence."'" *Tahah*, 302 Kan. at 788 (quoting *State v. Crawford*, 300 Kan. 740, 749, 334 P.3d 311 [2014]). However, "[a] prosecutor's misstatement of law constitutes prosecutorial error." *State v. Ross*, 310 Kan. 216, 221, 445 P.3d 726 (2019).

*Discussion*

"Unquestionably, a first-degree premeditated murder conviction requires death to have been the intended result of an act." *State v. Seba*, 305 Kan. 185, 207, 380 P.3d 209 (2016). But we do not view the prosecutor's remarks as an incorrect statement of law. The first sentence of the challenged comments—"It was not intended for [Goodpaster] to survive that trip and he did not"—reflects a commentary upon the evidence; the remainder of the at-issue remarks flow from that commentary. See, e.g., *State v. Brownlee*, 302 Kan. 491, 514-19, 354 P.3d 525 (2015) (finding the prosecutor's

18

comments to be proper "because they described the totality of the evidence regarding premeditation, *i.e.*, the use of a deadly weapon, the dealing of lethal blows after the victim had been rendered helpless, additional conduct before and after the killing, and the lack of provocation").

This reading comports with the remainder of both prosecutors' closing arguments. For example, the prosecutor who made the challenged statements prefaced them by informing the jury that "to be clear, it's not enough that after he died they're like oh, we're glad he's dead, but that's not what the State is asking you to draw some kind of inference from. You have evidence of the intent before the act." The prosecutor then segued into the State's theory that the parties formed the intent to kill Goodpaster "no later, at a minimum, than when he's loaded into that truck." The prosecutor then emphasized Dr. Distefano's testimony in attempting to rule out extraneous causes but acknowledged that the evidence showed that the most likely cause of Goodpaster's death—other than the official opinion of hanging—was "asphyxiation by having an obstructed airway . . . the gag in the mouth, something around his face, a broken nose so he can't breathe—or bloody nose, or positional asphyxiation, being crammed [on] a floorboard, [Morris] on top of him, again, battered and beaten, weakened." Later, in rebuttal, another prosecutor emphasized this theme: "Do you put in [*sic*] a gag into somebody's mouth and duct tape their mouth shut and intend that they live when they're being loaded into a truck?"

Thus, the prosecutors correctly informed the jury that the acts which produced Goodpaster's death—including gagging him and stuffing him in the back of the truck—must have been intended to *result* in Goodpaster's death, in order to find Hillard guilty of premeditated murder. As the prosecutors' comments appear to be a fair characterization of the evidence and do not misstate the law, we find no error in them.

19

*The jury instructions were legally and factually appropriate.*

Hillard next challenges the district court's decision to add the phrase "or another for whose conduct she is criminally responsible" to the descriptions of the various charges throughout the jury instructions.

*Standard of Review*

When presented with a claim that a district court has erred in issuing or refusing to issue a jury instruction:

> "(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in [*State v. ]Ward*[, 292 Kan. 541, 565, 256 P.3d 801 (2011)]." *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012).

"The first element of this analysis ultimately affects the last one 'in that whether a party has preserved an issue for review will have an impact on the standard by which we determine whether an error is reversible.'" *Ross*, 310 Kan. at 223 (quoting *State v. Barber*, 302 Kan. 367, 377, 353 P.3d 1108 [2015]). Where a defendant preserves an objection, "any error is reversible only if this court determines that there is a reasonable probability that the error affected the outcome of the trial in light of the entire record." *State v. Stanley*, 312 Kan. 557, 562, 478 P.3d 324 (2020). Moreover, where the basis of an objection to a jury instruction in district court differs from the basis for the issue raised on

20

appeal, we review the instructions for clear error. *State v. Gleason*, 299 Kan. 1127, 1179, 329 P.3d 1102 (2014), *rev'd and remanded on different grounds sub nom. Kansas v. Carr*, 577 U.S. 108, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016); *State v. Robinson*, 293 Kan. 1002, 1036, 270 P.3d 1183 (2012).

*Discussion*

Hillard argues that the phrase "or another for whose conduct she is criminally responsible" incompletely states the law of aiding and abetting and is thus legally inappropriate. Hillard also argues that, although the full aiding and abetting instruction was properly given, the instructions on the various charges failed to refer to that instruction.

But jury instruction challenges are not reviewed in isolation, and juries are presumed to follow all instructions. *State v. Llamas*, 298 Kan. 246, 261, 311 P.3d 399 (2013). Hillard correctly observes that the challenged phrase neither appears in the statutory authority for the theory of aiding and abetting, K.S.A. 2020 Supp. 21-5210(a), nor in PIK Crim. 4th 52.140, nor in the statutory definitions for the various crimes with which Hillard was charged.

Nevertheless, the full instruction on aiding and abetting was provided to the jury. That the jury was required to read more than one of the instructions in order to comprehend the full legal importance of the phrase "or another for whose conduct she is criminally responsible" does not render that phrase erroneous.

Nor are we convinced that the absence of specific language referring the jury *to* the complete aiding and abetting instruction constituted a fatal deficiency. The authority on which Hillard relies on for this point, *State v. Richardson,* 290 Kan. 176, 182-83, 224

P.3d 553 (2010), is inapposite. In *Richardson*, the defendant was charged with felony fleeing or attempting to elude a police officer based on the commission of five or more moving violations. The jury was simply never instructed on the nature of these moving violations, however, and the court concluded that the jury could not rely on its common knowledge to assess the meaning of "moving violation." 290 Kan. at 179-82. The court went on to note that, "When a statute makes the commission of a crime or the intent to commit a crime an element of another crime, the jury instructions must set out the statutory elements of the underlying offense." 290 Kan. at 182.

Here, the jury was correctly instructed on the full law of aiding and abetting. Though the challenged phrase was an incomplete summary of that law by itself, the inclusion of the full aiding and abetting instruction completed that summarization for the jury, rendering the instructions legally appropriate. We find no error in the district court's inclusion of the challenged phrase.

*The prosecutor did not commit error by describing the proper sequence of consideration of lesser included offenses during closing arguments.*

Hillard next claims the prosecutor committed prosecutorial error by misstating the law with respect to the way the jury should consider lesser included offenses. Hillard challenges the following three comments:

- "Recklessly, when a defendant consciously disregards a substantial or unjustifiable risk that a result will follow. Again, this reckless mens rea, you don't have to consider that unless you get way down on the list of homicide lessers. And we'll get to those for a moment, but for the most part the crimes that have been alleged or all the crimes that have been charged involve intentional or knowing conduct."

- "But further, as we stop here at counts one and two, you do not need to consider any of those lessers, second intentional, second reckless, all that stuff, if you find the defendant guilty of either or both of count one or count two. And the State argues that's precisely what you should do."

- "You only have to consider the lesser of kidnapping if you do not believe that any bodily harm happened to [S.S.] whatsoever. The State would submit to you that there is ample evidence of at least some bodily harm happening to [S.S.] during her kidnapping in that vehicle."

Based on *State v. Sims*, 308 Kan. 1488, 1505, 431 P.3d 288 (2018), Hillard argues that these statements constituted incorrect statements of law. We find this argument unpersuasive. In *Sims*, we rejected the "simultaneous consideration rule," which required a jury to evaluate lesser included offenses simultaneously with charged offenses, in favor of the "sequential instructions" set forth in the PIK. 308 Kan. at 1503-04. Sims' jury instructions used language similar to the instructions in Hillard's trial, i.e., "'[i]f you do not agree that the defendant is guilty of [greater offense], you should then consider [lesser offense].'" 308 Kan. at 1498. We found no problem with this language and held that "a district court is not required to instruct a jury to consider a lesser included homicide offense simultaneously with any greater homicide offense." 308 Kan. at 1503.

Unlike the present case, *Sims* also involved a claim of imperfect self-defense. We thus considered the impact of the jury instructions on Sims' due process right to present his theory of defense. 308 Kan. at 1504. Ultimately, we concluded that the phrasing of the jury instructions—in particular, the instruction discussing self-defense—did not prevent the jury from considering the lesser included offense of voluntary manslaughter. Instead, "[b]y instructing as it did, the trial court ensured the jury would consider *all* the offenses and select the appropriate verdict." (Emphasis added.) 308 Kan. at 1505. Thus,

23

*Sims* is inapposite for the proposition Hillard seeks to ascribe it: that all possible lesser included offenses must be given equal weight when offered to the jury.

As we read the prosecutor's comments, they merely reframe what the jury instructions themselves already said, e.g., "If you do not agree that the State has met its burden . . . you should then consider the lesser included offense . . . ." Moreover, "directing jurors to move on to consideration of lesser included offenses *only* if they do not agree or if they do not find the defendant guilty of the charged offense is not coercive and correctly states the law." (Emphasis added.) *State v. Parker*, 301 Kan. 556, 563, 344 P.3d 363 (2015). By effectively telling the jury to do just that, the prosecutor did not err.

*Hillard's conviction for conspiracy to distribute a controlled substance was not supported by sufficient evidence.*

Hillard next challenges the sufficiency of the evidence supporting her conviction for conspiracy to distribute a controlled substance. Alternatively, Hillard argues that the prosecutor misstated the law regarding distribution of controlled substances, warranting reversal of this conviction.

*Standard of Review*

Hillard's argument primarily turns on an interpretation of the statutory definition of "distribute" in K.S.A. 2020 Supp. 21-5701(d). The interpretation of statutory language is a question of law which is reviewed de novo on appeal. *Schmidtlien Elec., Inc. v. Greathouse*, 278 Kan. 810, 819, 104 P.3d 378 (2005).

Secondarily, Hillard's claim attacks the sufficiency of the evidence.

"'When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. This court has also recognized that there is no distinction between direct and circumstantial evidence in terms of probative value.'" *State v. Colson*, 312 Kan. 739, 749-50, 480 P.3d 167 (2021) (quoting *State v. Potts*, 304 Kan. 687, 694, 374 P.3d 639 [2016]).

*Discussion*

In Kansas, conspiracy "consists of two essential elements:  (1) An agreement between two or more persons to commit or assist in committing a crime; and (2) the commission by one or more of the conspirators of an overt act in furtherance of the object of the conspiracy." *State v. Hill*, 252 Kan. 637, Syl. ¶ 1, 847 P.2d 1267 (1993); see *State v. Cottrell*, 310 Kan. 150, 155, 445 P.3d 1132 (2019).

K.S.A. 2020 Supp. 21-5705 criminalizes the act of distributing or possessing with intent to distribute various substances. K.S.A. 2020 Supp. 21-5701(d) defines distribute as:

"the actual, constructive or attempted transfer from one person to another of some item whether or not there is an agency relationship. 'Distribute' includes, but is not limited to, sale, offer for sale or any act that causes some item to be transferred from one person to another. 'Distribute' does not include acts of administering, dispensing or prescribing a controlled substance as authorized by the pharmacy act of the state of Kansas, the uniform controlled substances act or otherwise authorized by law."

The State argues that the "distribution component would be satisfied through the attempted transfer of methamphetamine from the dealer to Cummings." In the State's

25

formulation, the simple act of providing money to a middleman to acquire illicit substances would be sufficient to make one guilty of the crime of conspiracy to distribute a controlled substance, irrespective of any intended "further transfers" after possession was achieved.

In *State v. Crosby*, 312 Kan. 630, 636, 479 P.3d 167 (2021), the parties disputed "whether a person who possesses a drug by receiving a distribution from another can be convicted of violating K.S.A. 2019 Supp. 21-5705(a)." There, we determined that "under any conceivable theory, possession is an element of the crime of distribution." 312 Kan. at 636. As we reasoned:

"Distribute is defined as 'the actual, constructive or attempted transfer from one person to another of some item whether or not there is an agency relationship.' K.S.A. 2019 Supp. 21-5701(d). This 'includes, but is not limited to, sale, offer for sale or any act that causes some item to be transferred from one person to another.' K.S.A. 2019 Supp. 21-5701(d). Possession is defined as 'having joint or exclusive control over an item with knowledge of and intent to have such control or knowingly keeping some item in a place where the person has some measure of access and right of control.' K.S.A. 2019 Supp. 21-5701(q). We conclude it is impossible to 'transfer' a controlled substance 'from one person to another' without having 'joint or exclusive control over' the controlled substance first. See K.S.A. 2019 Supp. 21-5701(d); K.S.A. 2019 Supp. 21-5701(q). As a definitional matter, a person cannot transfer something one does not control. Therefore, in order to convict a defendant of distribution of a controlled substance under K.S.A. 2019 Supp. 21-5705(a), the State must present sufficient evidence of possession as a necessary part of the crime." 312 Kan. at 637-38.

Here, the jury instructions required the State to prove that Hillard "agreed with others to commit or assist in the commission of distribution of a controlled substance." What the State actually proved was that Hillard agreed to give Goodpaster $185 so that he could provide her with methamphetamine. The jury was not presented with evidence

26

as to Hillard's knowledge concerning Goodpaster's methodology for the acquisition of the methamphetamine, or as to Hillard's intentions for the drug once she received it. Nor was the jury presented with evidence that the methamphetamine Goodpaster was paid to acquire would be distributed to anyone *but* Hillard by Goodpaster. In other words, the State established that Hillard conspired to "distribute" a controlled substance to herself only. In the absence of evidence establishing an actual agreement to "distribute" the methamphetamine to anyone beyond herself, we find this to be insufficient to support a conviction for conspiracy to distribute a controlled substance; at most, the State proved a conspiracy for Hillard to *possess* the methamphetamine. Consequently, we reverse Hillard's conviction on this count.

*The district court did not abuse its discretion in permitting the admission of an audio recording of a portion of Goodpaster's torture.*

Hillard next argues the district court abused its discretion in admitting an audio recording of Goodpaster screaming in reaction to a threat, arguing that this evidence was more prejudicial than probative. Hillard properly objected to the admission of this evidence at trial, preserving the issue for appeal.

*Standard of Review*

Under K.S.A. 60-445, a district court is empowered with the discretion to exclude evidence if it finds "that its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered." We have often recognized that this authority also extends to unfairly prejudicial evidence. See, e.g. *State v. Lee*, 266 Kan. 804, 813, 977 P.2d 263 (1999) (noting that a district court also has "inherent power . . . to exclude any evidence which may unfairly prejudice a jury"). The district court's

decision as to whether the probative value of evidence is outweighed by substantial risk of undue prejudice is reviewed for abuse of discretion. See, e.g., *State v. Wilson*, 295 Kan. 605, 612, 289 P.3d 1082 (2012); *State v. Abu-Fakher*, 274 Kan. 584, 594, 56 P.3d 166 (2002).

*Discussion*

Hillard's argument concerns a roughly two-minute portion of an audio recording captured by Jeff's iPhone during the interrogation of Goodpaster. Essentially, Hillard claims that Goodpaster "was not actually injured when his intense and prolonged screaming was recorded." She concedes that the recording was "minimally relevant" to the "intent to terrorize" aspect of her aggravated kidnapping charge (and the appurtenant felony-murder charge) but argues that it carried the potential to mislead the jury and inflame its passions.

We are not convinced. While the audio recording would be extraordinarily disturbing to most listeners, Hillard's supposition that *no* harm was done to Goodpaster during the recording—after she is heard threatening to cut his testicles—is purely speculative. It is true that, according to the autopsy, Goodpaster's testicles were not cut, but it does not necessarily follow that he was not hurt *at all* during the at-issue portion of the recording. For purposes of our analysis, it does not matter whether she carried out the specifics of her threat—particularly because it appears that *some* injury was done to Goodpaster during (or slightly before) this time. For example, as Jeff said at the conclusion of this round of screaming: "Don't you . . . bleed all over that floor. You gonna be licking that shit up."

Moreover, the recording was highly probative of the conduct of the parties interrogating Goodpaster. Even if Hillard is correct in her assumption that Goodpaster

28

was not physically harmed in this excerpt, it is completely understandable that Goodpaster would react so strongly to the threats made against him at knifepoint, as his shorts were being slit open. Shortly after that exchange, for instance, Jeff told Goodpaster, "If you remember I told ya. You stand behind [Hillard], she'll take you places. But I also told ya, she'll bury your ass. . . . You went the wrong way." Moreover, the audio confirms some of the testimony of both Bussart and S.S., whose credibility were challenged both at trial and on appeal. Finally, as Hillard herself admits, the recording was probative as to various aspects of both the felony murder and the aggravated kidnapping charges.

Again, we note that this audio evidence was extremely disturbing—after all, at one point during the interrogation, Jeff went outside to turn on a loud motorcycle in an effort to drown out Goodpaster's screams, although that would have occurred long after the conclusion of the audio recording presented to the jury. But the noise of Goodpaster's screams was no more disturbing than the acts and circumstances that produced those screams. The district court did not abuse its discretion in admitting it.

*Hillard's prior California crime was properly classified as a person felony.*

Finally, Hillard argues that the district court erred by classifying a prior out-of-state conviction as a person felony.

*Standard of Review*

Under K.S.A. 2018 Supp. 21-6811(e)(3), the law applicable at the time of Hillard's conviction, "[c]lassification of prior offenses for criminal history purposes involves interpretation of the KSGA; statutory interpretation is a question of law subject to

unlimited review." *State v. Wetrich*, 307 Kan. 552, 555, 412 P .3d 984 (2018). Additionally:

> "For an out-of-state conviction to be comparable to an offense under the Kansas criminal code, the elements of the out-of-state crime cannot be broader than the elements of the Kansas crime. In other words, the elements of the out-of-state crime must be identical to, or narrower than, the elements of the Kansas crime to which it is being referenced." 307 Kan. at 562.

We recognize that the Legislature has since amended K.S.A. 21-6811(e)(3). See L. 2019, ch. 59, § 13. However, as Hillard's convictions arose before the effective date of this legislation, it does not control our analysis of this issue.

*Discussion*

Hillard argues that her March 8, 1993 California conviction for "Willful Child Cruelty:  Poss Injury/Death" under Cal. Penal Code § 273a(1) is broader than the comparable Kansas crime—K.S.A. 2020 Supp. 21-5601—because it also encompasses the act of inflicting or permitting mental suffering. K.S.A. 2020 Supp. 21-5601(a) proscribes the act of "knowingly and unreasonably causing or permitting a child under the age of 18 years to be placed in a situation in which the child's life, body or health may be endangered." In contrast, Cal. Penal Code § 273a(1) (1992) provided:

> "(1) Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of such child to be injured, or willfully causes or permits such child to be placed in such situation that its person or health is

endangered, is punishable by imprisonment in the county jail not exceeding one year, or in the state prison for 2, 4, or 6 years."

The State argues that K.S.A. 2020 Supp. 21-5601(a)'s reference to "health" encompasses mental health as well as physical health. We agree. The plain meaning of "health" includes both mind and body. See, e.g., Black's Law Dictionary 865 (11th ed. 2019). Lacking statutory ambiguity, we need not resort to the canons of construction to divine indirectly the Legislature's intent. See, e.g., *State v. Brosseit*, 308 Kan. 743, 748, 423 P.3d 1036 (2018). On this point, we thus disagree with the reasoning of the *State v. Daniels*, No. 87,790, 2003 WL 22283001, at *9 (Kan. App. 2003) (unpublished opinion), *aff'd* 278 Kan. 53, 91 P.3d 1147 (2004), when it applied the maxim of *ejusdem generis* to interpret the meaning of "health." Instead, as we emphasized with respect to K.S.A. 21-3608, the predecessor of K.S.A. 2020 Supp. 21-5601:

> "The State has a compelling interest in the well-being of its children and particularly in their protection from *all* forms of cruelty, neglect, degradation, and inhumanity. The State's interest in protecting children is compelling, and K.S.A. 21-3608 is reasonably drawn to carry out that legislative purpose. [Citation omitted.]" (Emphasis added.) *State v. Wilson*, 267 Kan. 550, 559, 987 P.2d 1060 (1999).

Despite our determination that the term "health" is unambiguous, we also briefly address Hillard's point that, although the predecessor to K.S.A. 2020 Supp. 21-5601(a), K.S.A. 21-3608, *formerly* included a reference to "mental distress," this language was removed following statutory amendments. See L. 1992, ch. 298, § 36. As that version of the statute read, in relevant part:

"(1) Endangering a child is willfully:

> (a) Causing or permitting a child under the age of eighteen (18) years to suffer unjustifiable physical pain or mental distress; or

> (b) Unreasonably causing or permitting a child under the age of eighteen (18) years to be placed in a situation in which its life, body or health may be injured or endangered." K.S.A. 1992 Supp. 21-3608(1)(a)-(b).

Notably, the *entire* subsection referencing "[c]ausing . . . physical pain or mental distress" was removed by the 1992 amendments, leaving the statute in more or less its present form: "(a) Endangering a child is intentionally and unreasonably causing or permitting a child under the age of 18 years to be placed in a situation in which the child's life, body or health may be injured or endangered." K.S.A. 1993 Supp. 21-3608(a). This change did not surgically excise "mental distress," as Hillard's argument would otherwise imply. Consequently, we are unpersuaded that the Legislature intended to change the scope of the statute to eliminate *mental* health from the overall portfolio of "health." We thus find that Hillard has not established that the California statute is broader than its Kansas equivalent and affirm the district court's classification of Hillard's prior crime as a person felony.

## CONCLUSION

Hillard's conviction for conspiracy to distribute a controlled substance is reversed for insufficient evidence. We affirm her remaining convictions.

Affirmed in part and reversed in part.

32